931 F.2d 764
 55 Fair Empl.Prac.Cas. 1466,
56 Empl. Prac. Dec. P 40,860, 59 USLW 2772,
33 Fed. R. Evid. Serv. 760
 Annie R. BUSBY, Plaintiff-Appellant,
v.
CITY OF ORLANDO, Frederick J. Walsh, individually and in his
official capacity as Chief of the Orlando Police Department,
Captain Ed Paden, individually and in his official capacity
as Captain for the Orlando Police Department, Lt. Richard
Noble, individually and in his official capacity as Lt. for
the Orlando Police Department, Richard Mays, individually
and in his official capacity as Major for Orlando Police
Department, Defendants-Appellees.
 No. 89-3528.
 United States Court of Appeals,
Eleventh Circuit.
 May 17, 1991.
 
 Homero Leon, Jr., Greater Orlando Area Legal Services, Inc., Orlando, Fla., for plaintiff-appellant.
 Jeffrey G. Slater, Eubanks, Hilyard, Rumbley, Meier & Lengauer, Orlando, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY and JOHNSON, Circuit Judges, and ALLGOOD*, Senior District Judge.
 PER CURIAM:
 
 
 1
 Annie R. Busby appeals the decision of the district court regarding various matters in her civil rights suit against the City of Orlando, et al., which resulted in an adverse jury verdict. She claims that the defendants-appellees, sued in their individual and official capacities under 42 U.S.C. Secs. 1981, 1983, 2000e et seq. (1988), were erroneously dismissed from suit. She also claims that the district court abused its discretion in excluding several exhibits and witnesses' testimony. We find that the district court correctly granted directed verdicts for appellees Chief Frederick Walsh, Major Richard Mays, Captain Ed Paden, and Lieutenant Richard Noble in their official capacities, and correctly granted a directed verdict in favor of Walsh in his individual capacity. However, because we find that Busby's claim against Chief Walsh was not groundless or without foundation, we VACATE the district court's award of attorney's fees to Walsh. Notwithstanding our holding that the district court properly granted directed verdicts for the officially named defendants, we find that the district court's erroneous charge to the jury regarding the directed verdicts amounted to prejudicial error to Busby in her suit against the City of Orlando, and accordingly, we REVERSE. We also find that the court correctly granted directed verdicts in favor of the individually named defendants on the section 1983 first amendment claim. We find, however, that the court erroneously granted directed verdicts in favor of Paden, Mays, and Noble in their individual capacities on the section 1983 equal protection claim. We therefore REVERSE these rulings. We also REVERSE the district court's decision on the following evidentiary issues: excluding racial discrimination statistics regarding the Orlando Police Department, and a corresponding graph summarizing and explaining those statistics; excluding the expert testimony of Charles English, a psychological counselor tendered to explain those exhibits and to testify as to psychological impact on Busby; excluding black co-worker Joyce Brinson's testimony; and excluding the introduction of an Internal Affairs Report corroborating Busby's accusations regarding Paden. We AFFIRM, however, the court's evidentiary rulings regarding the testimony of co-worker Joanne Jarboe and Lieutenant Lovett, because Busby failed to perfect the record on appeal by making an appropriate proffer of the evidence. We also AFFIRM the court's exclusion of a large, disorganized collection of documents, but recognize that such documents could be admitted upon retrial of the case if properly presented. Finally, we REMAND the case for proceedings consistent with this opinion.
 
 BACKGROUND
 
 2
 Plaintiff-appellant Annie Busby, a black woman, worked as an Airport Safety Officer ("ASO") for the Orlando Police Department ("OPD") from 1979 until her termination in 1986. According to the appellees, Busby was fired after she continually refused to obey a superior officer's order to sign an acknowledgement that she had read and received a document that outlined certain OPD policies and procedures. A number of events precipitated this ultimate showdown with her superiors that culminated in her termination.
 
 
 3
 In early 1985, Busby sent letters to all of the airlines at the Orlando International Airport (where she worked as an ASO) requesting the operations managers at each airline to encourage their employees to donate ten dollars each to a veterans' fund that Busby was trying to establish.[1] Following this solicitation, one of the airlines filed a complaint with the OPD. The internal affairs division of the OPD investigated the matter and then referred it to the State Attorney's Office because of the potentially criminal nature of her conduct. The State Attorney's Office recommended that the OPD handle the matter internally, and did not file any criminal charges. The OPD ultimately did discipline Busby for soliciting. She received a written censure.
 
 
 4
 While the internal affairs division was still investigating Busby's solicitation matter, Busby wrote a number of letters and memos criticizing various officers in the OPD. She sent a letter to the Mayor of Orlando, as well as to other public commissions around the City of Orlando and the state of Florida. According to Busby, she wrote the letters only after first consulting with her superior officer, appellee Captain Ed Paden. She testified that she had complained to Paden about several problems she perceived to exist at OPD. Also, she claimed that she had confronted Paden himself and accused him of having extramarital sexual affairs with subordinates.
 
 
 5
 Busby was disciplined with a forty-hour suspension for conducting her letter writing campaign. Major Richard Mays instructed Busby to cease making accusations in violation of departmental policies that prohibited discussing pending investigations. Additionally, appellee Lieutenant Richard Noble also ordered Busby to cease making such remarks.
 
 
 6
 Despite this, Busby began to make new complaints to persons outside of the OPD. She complained that Paden had referred to her in conversation with others as a "black bitch," and that her duty assignment, which included driving a gasoline powered golf cart, was endangering her health. She claimed that the fumes emitted from the cart had injured her. Against Busby's doctor's recommendation, appellees Noble, Paden, and Mays ordered her to continue to ride the cart. She refused to comply and was shortly thereafter charged with insubordination. In addition, she was disciplined for a second time for making criticisms to the public without investigation.
 
 
 7
 Upon receiving this second discipline, Busby indicated to her superiors that no one had explained to her the OPD's policies regarding procedures employees must follow when making complaints. Mays decided to issue a letter to Busby outlining the department's written policy regarding complaint procedure. He instructed Noble to present the letter to Busby and to order her to sign the letter as "received, read, and understood."
 
 
 8
 On July 21, 1986, Noble ordered Busby to sign the complaint procedure policy letter, pursuant to Mays's order. The letter essentially stated that before an employee may complain publicly about the OPD, the employee must first give the department the opportunity to investigate the matter internally.[2] Busby refused to sign the memo as "received, read, and understood," absent the advice of a Police Benevolent Association representative. Upon her refusal to sign, Noble requested that she leave his office while he consulted with Paden and Mays over the telephone. Paden, Mays, and Noble agreed that Busby's refusal to sign was insubordination, that she was not entitled to have a representative present, and that further refusal to sign was cause for termination. They decided that Noble would call her back into his office, with witnesses present, order her to sign in the presence of the witnesses, and relieve her from duty if she refused to sign. Busby again refused to sign the letter, and she was immediately relieved of duty. Mays subsequently terminated Busby. In deciding to terminate Busby's employment, Mays considered Busby's previous disciplinary history, in addition to the incident in Noble's office.
 
 
 9
 Busby filed suit in federal district court against the City of Orlando, Mays, Paden, Noble, and Orlando Police Department Chief of Police Frederick Walsh. She alleged that the appellees had violated her civil rights, and her right to free speech. The district court granted Walsh, Paden, Mays, and Noble a directed verdict for all claims against them in their individual capacities, and a directed verdict for all claims against them in their official capacities, reasoning that the official capacity claims were identical to the claim against the City of Orlando. At trial, the jury returned a verdict in favor of the City of Orlando.
 
 
 10
 Busby appeals on several grounds. She appeals the district court's granting of directed verdicts in favor of Walsh, Paden, Mays, and Noble. She also appeals the district court's decision to merge the official capacity suits into her suit against the City of Orlando directly, and claims further that the judge made a prejudicial charge to the jury when dismissing the officially-sued defendants. Finally, she appeals several evidentiary rulings by the district court. The evidentiary rulings that she appeals include, but are not limited to, the following: the exclusion of expert testimony from one of Busby's witnesses who was tendered to explain how certain racial discrimination statistics[3] were compiled, and to comment on the psychological impact on Busby from her experiences at the OPD; the exclusion of an internal affairs report concluding that Paden had been involved in extramarital affairs; and, the exclusion of testimony offered to prove the existence of a racially hostile environment at the OPD.
 
 DISCUSSION
 I. Civil rights claims
 
 11
 Busby sued Chief Walsh, Major Mays, Captain Paden, and Lieutenant Noble in both their individual and official capacities under 42 U.S.C. Sec. 1983, alleging that appellees had violated her free speech, due process, and equal protection[4] rights guaranteed under the first and fourteenth amendments. In addition, she sued the appellees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1988),[5] for racial harassment and discriminatory termination.[6]
 
 
 12
 A. Individual capacity liability & qualified immunity
 
 
 13
 When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. See Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). If sued "individually," a municipal officer may raise an affirmative defense of good faith, or "qualified," immunity. See Kentucky v. Graham, 473 U.S. at 166-67, 105 S.Ct. at 3105-06. Hence, in the instant matter, the pretrial stipulation declared that "[t]he parties agree that Defendants, FREDERICK J. WALSH, ED PADEN, RICHARD NOBLE and RICHARD MAYS, enjoy a qualified immunity for those claims being pursued against them under provisions of the Civil Rights Act of 1964 [i.e., Title VII]." However, with respect to suits under Title VII, we agree with the Fifth Circuit, which determined that no qualified immunity exists for individuals sued under Title VII. Harvey v. Blake, 913 F.2d 226, 227 (5th Cir.1990). No immunity from such actions exists because such claims must be made against the municipal officer in his official capacity, not in his individual capacity. See id. at 227-28. "Because the doctrine of qualified immunity protects a public official from liability for money damages in [his or] her individual capacity only, the doctrine is inapplicable in the Title VII context." Id. at 228. Therefore, a qualified immunity analysis is unnecessary under Title VII.
 
 
 14
 Individual capacity suits under Title VII are similarly inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act. See Clanton v. Orleans Parish School Bd., 649 F.2d 1084, 1099 & n. 19 (5th Cir.1981)[7]; see also 42 U.S.C. Sec. 2000e(b) (1988) (definition of "employer"); 42 U.S.C. Sec. 2000e-2 (1988) (violation for "employer" to discriminate); 42 U.S.C. Sec. 2000e-5(g) (1988) (relief for violation of Sec. 2000e-2). We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.
 
 
 15
 The district court's order was unclear with respect to which claims were being dismissed by directed verdict. To the extent that the district court's directed verdict in favor of Walsh, Mays, Paden, and Noble in their individual capacities reached the Title VII claims, we AFFIRM. Such claims ought to be considered as made against the City.
 
 
 16
 When the defense of qualified immunity is available to a particular defendant in a section 1983 context, a plaintiff must establish a lack of objective good faith to avoid a directed verdict in favor of the defendant. See Barnett v. Housing Auth., 707 F.2d 1571, 1582 (11th Cir.1983); cf. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (summary judgment); Schopler v. Bliss, 903 F.2d 1373, 1380 (11th Cir.1990) (motion to dismiss). In this case, all the parties stipulated that the individually-sued defendants were entitled to a qualified immunity. If Busby has produced evidence showing that the appellees acted outside the scope of the qualified immunity, i.e., did not act in "good faith," then the appellees are not entitled to a directed verdict. Cf., e.g., Peppers v. Coates, 887 F.2d 1493, 1498 (11th Cir.1989) (summary judgment awarded for failure to rebut "good faith").
 
 
 17
 The test for good faith is objective. "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2740. This standard shields all government officials except those who either are plainly incompetent or who knowingly violate the law. Nicholson v. Georgia Dep't of Human Resources, 918 F.2d 145, 146 (11th Cir.1990) (citing Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1503 (11th Cir.1990)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting Harlow, 457 U.S. at 818, 819, 102 S.Ct. at 2738, 2739) (citation omitted). As long as the defendant could reasonably have thought his or her action to be consistent with the rights he or she is alleged to have violated, the defendant is entitled to immunity. Id. 483 U.S. at 638, 107 S.Ct. at 3038. The plaintiff has the burden of showing that the defendant violated clearly established constitutional rights. Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983); see Saldana v. Garza, 684 F.2d 1159, 1163 (5th Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983).
 
 1. First amendment free speech claim
 
 18
 Busby alleged in Count III that appellees unconstitutionally violated her first amendment free speech rights.[8] She claimed that appellees fired her in retaliation for publicizing malfeasance by her supervisors, and for complaining about fumes emitted from the golf cart in which she was required to ride. Additionally, Busby claimed that Paden acted to cause her termination in order to prevent the discovery of Paden's extramarital affairs.[9]
 
 
 19
 The relevant question in this case is whether a reasonable OPD supervisor could have believed appellees' actions in disciplining Busby for failing to follow OPD complaint procedure to be lawful, in light of clearly established law. See Anderson, 483 U.S. at 641, 107 S.Ct. at 3040. "[Appellees'] subjective belief[s] about [their actions] are irrelevant." Id. In determining whether a reasonable person would have known that appellees' actions violated the first amendment, we must examine the applicable law regarding protection of employee speech under the first amendment, enunciated by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and applied in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Then, we must determine, in light of Pickering and Connick, whether a reasonable defendant could believe that his actions were lawful. We make this last determination in accordance with our circuit's test in Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323-24 (11th Cir.1989), for determining qualified immunity in this context.
 
 
 20
 The Supreme Court has never established a bright-line test for determining when a public employee may be disciplined in response to that employee's speech. Dartland, 866 F.2d at 1323. Instead, Pickering established a case-by-case balancing of interests test. Id. Although "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," Connick, 461 U.S. at 142, 103 S.Ct. at 1687, an employee's interest as a citizen in commenting on matters of public concern must be balanced against the state's interest as an employer "in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1735. Because no bright-line standard exists to put the employer on notice of a constitutional violation, this circuit has recognized that a public employer is entitled to immunity from suit unless the Pickering balance "would lead to the inevitable conclusion that the discharge of the employee was unlawful." Dartland, 866 F.2d at 1323. Accordingly, this court need not decide the precise result of applying the Pickering balancing test to Busby. See id. at 1324. Instead, we need only decide whether such a result would be so evidently in favor of protecting the employee's right to speak that reasonable officials in appellees' place "would necessarily know that the termination of [Busby] under these circumstances violated [Busby's] constitutional rights." Id.
 
 
 21
 Assuming that the matters upon which Busby commented were matters of public concern, on Busby's side of the Pickering scale is her interest in expressing her opinion on the alleged malfeasance of her superiors. On appellees' side of the scale is their interest in maintaining loyalty, discipline, good working relationships among the employees, and, in general, the OPD's reputation. See id. In this regard, appellees' case is strengthened by the fact that the OPD is a quasi-military organization. In quasi-military organizations such as law enforcement agencies, comments concerning co-workers' performance of their duties and superior officers' integrity can "directly interfere[ ] with the confidentiality, esprit de corps and efficient operation of the [police department]." Egger v. Phillips, 710 F.2d 292, 327 (7th Cir.) (Coffey, J. concurring in part), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). "[D]iscipline is a necessary component of a smoothly-operating police force. Although this necessity of discipline does not rise to the same level as required by the military, ... discipline must be maintained among police officers during periods of active duty." Williams v. Board of Regents, 629 F.2d 993, 1003 (5th Cir.1980) (citation omitted), cert. denied sub. nom., Saye v. Williams, 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981); see Egger, 710 F.2d at 327-28 (Coffey, J., concurring in part). We agree that courts should consider and give weight to the need for maintaining a close working relationship in quasi-military organizations like police departments. See Saye v. Williams, 452 U.S. 926, 929, 101 S.Ct. 3063, 3065, 69 L.Ed.2d 428 (1981) (Rehnquist, J., dissenting from denial of certiorari); Egger, 710 F.2d at 328 (Coffey, J., concurring in part).
 
 
 22
 Appellees did not bar Busby from voicing her complaints; they merely sought to delay her access to a public forum until after the OPD's internal affairs division could investigate her complaints. We recognize that some of Busby's allegations against Paden ultimately proved true. Yet, under Pickering, it is far from clear that any of the appellees violated the first amendment in terminating Busby for her refusal to acknowledge the policy of delaying publication of acts of malfeasance until after such sensitive allegations could be investigated internally. We therefore decline to hold that appellees would inevitably have been led to conclude that their actions violated Busby's constitutional right to free speech.
 
 
 23
 Moreover, Busby's supervisors were merely seeking to enforce written OPD regulations by attempting to delay Busby's access to the public forum. To say that the supervisors should have known under Dartland that they were unconstitutionally infringing upon Busby's free speech interest would require a finding that the OPD regulations themselves are unconstitutional. Busby never challenged the constitutionality of the regulations before the trial court or this court. We therefore decline to undertake a detailed determination of the constitutionality of the regulations under Pickering. However, we reiterate our belief that quasi-military organizations have special disciplinary concerns. Quasi-military organizations, such as the OPD, generally by necessity must cast regulations in broad terms. See Vorbeck v. Schnicker, 660 F.2d 1260, 1262 (8th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982). Additionally, institutions such as the military and police have needs "which must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society." Id. at 1263. In light of the OPD's interests in maintaining loyalty, discipline, morale, and a favorable reputation with the public, we cannot say that, under Pickering, regulations that merely delay access to a public forum are so clearly unconstitutional so as to put appellees on notice that by enforcing the regulations they themselves were violating the law.[10] We agree with the district court's decision to grant a directed verdict in favor of Walsh, Mays, Paden, and Noble as to the free speech claim. Accordingly, we AFFIRM that portion of its opinion.
 
 2. Racial discrimination claim
 
 24
 We do not, however, agree entirely with the district court's finding of immunity on the racial discrimination claim under section 1983. The district court's oral explanation of the directed verdict is not completely clear. The parties' arguments preceding the court's ruling, however, aid in our interpretation of the ruling. After Busby rested her case, the defendants argued for a directed verdict on all claims--section 1981, section 1983, and Title VII--by asserting that Busby had not presented sufficient evidence to support a prima facie case for any of the claims. The defendants also argued that the section 1983 claim based upon the alleged first amendment violation was barred on the ground of qualified immunity, citing Dartland, supra. The defendants, however, made no other argument as to qualified immunity. At the conclusion of Busby's response to the defendants' argument, the court ruled:
 
 
 25
 [W]ith regard to the individuals, from the evidence that has been presented, it seems totally irresponsible that these individuals would be exposed to individual liability and punitive damages based on the flimsy evidence that has been presented against them.
 
 
 26
 ....
 
 
 27
 It was all done through the scope of their employment and they have qualified immunity in that employment.
 
 
 28
 ....
 
 
 29
 The court will grant a directed verdict as to those three individuals [Noble, Mays, and Paden].
 
 
 30
 (R10:212-13). Then, after summarizing its view of the evidence against Walsh, the court stated, "[t]he court finds that Chief Walsh's involvement in this case is totally bizarre, so the court will grant a directed verdict as to Chief Walsh and assess costs and attorney fees with regard to his defense." (R10:214). It seems, from a review of these statements, taken in context, that the district court determined that the individual defendants were entitled to qualified immunity only on the section 1983 claim based on the violation of Busby's first amendment rights. The court directed the verdict on all other claims in favor of the individually named defendants on the ground that Busby had not presented evidence sufficient to establish a prima facie case.
 
 
 31
 As noted above, the Harlow standard determines the scope of qualified immunity. In contrast to Busby's first amendment claim, it is clearly established that the equal protection clause affords Busby a right to be free from racial discrimination. See, e.g., Washington v. Davis, 426 U.S. 229, 239-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The defendants therefore could have made no claim of qualified immunity under Harlow to a section 1983 claim predicated upon equal protection. Though it is unclear whether the district court in fact directed a verdict in favor of the individual defendants on the ground of qualified immunity for this section 1983 claim regarding racial harassment and discrimination, such a ruling clearly would have been erroneous.
 
 
 32
 B. Section 1983 & official capacity liability
 
 
 33
 In contrast to individual capacity suits, when an officer is sued under Section 1983[11] in his or her official capacity, the suit is simply " 'another way of pleading an action against an entity of which an officer is an agent.' " Kentucky v. Graham, 473 U.S. at 165, 105 S.Ct. at 3105 (citing Monell v. Department of Social Servs., 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents. See id. 473 U.S. at 165-66, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985); Monell, 436 U.S. at 691, 98 S.Ct. at 2036; Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir.1990). Consequently, a plaintiff cannot rely on a respondeat superior theory to hold a municipality liable for individual actions of its officers. Monell, 436 U.S. at 691, 98 S.Ct. at 2036; Hearn v. City of Gainesville, 688 F.2d 1328, 1334 (11th Cir.1982). "[A] municipality cannot be held liable solely because it employs a tortfeasor." Monell, 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis in original). Instead, in order to recover against a municipality, a plaintiff must establish that the alleged racial discrimination or harassment occurred pursuant to a custom or policy of the municipality. Id. at 694, 98 S.Ct. at 2037; Gilmere v. City of Atlanta, 774 F.2d 1495, 1503 (11th Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); Hearn, 688 F.2d at 1334.
 
 
 34
 Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly (provided, of course, that the public entity receives notice and an opportunity to respond). See Kentucky v. Graham, 473 U.S. at 166, 105 S.Ct. at 3105; Brandon v. Holt, 469 U.S. at 471-72, 105 S.Ct. at 877-78. In Busby's action against the City of Orlando, the district court recognized that the intended defendant was actually the City. To keep both the City and the officers sued in their official capacity as defendants in this case would have been redundant and possibly confusing to the jury. We therefore AFFIRM the district court's decision to grant a directed verdict in favor of Walsh, Mays, Paden, and Noble as officially named defendants, because the City of Orlando remained as a defendant.
 
 
 35
 However, we find that the court's instruction at the close of Busby's case regarding the dismissal of the official-capacity defendants amounted to prejudicial error in the suit against the sole remaining defendant, the City of Orlando. The court made the following comment to the jury:
 
 
 36
 Ladies and gentlemen, the plaintiff has rested her case which means she was [sic] presented all of her evidence. While you were out, the parties presented certain motions and the court has dismissed all of the individual defendants from the case finding that all of their actions were legal actions within the scope of their employment so that the only remaining defendant for your consideration is the City of Orlando.
 
 
 37
 (R10:214-15) (emphasis added).
 
 
 38
 In assessing a claim that the court erred in instructing the jury, we must consider the jury instructions as a whole to determine whether the error, if any, was prejudicial. Johnson v. Bryant, 671 F.2d 1276, 1280 (11th Cir.1982). If the instructions, taken together, properly express the law applicable to the case, no reversible error has occurred, even if an isolated clause may be inaccurate, ambiguous, incomplete, or otherwise subject to criticism. Id.; see Gregg v. U.S. Indus., Inc., 887 F.2d 1462, 1472 (11th Cir.1989); Merchants Nat. Bank of Mobile v. United States, 878 F.2d 1382, 1388 (11th Cir.1989); Somer v. Johnson, 704 F.2d 1473, 1477-78 (11th Cir.1983). However, where "there is uncertainty as to whether the jury was actually misled, the [district court's] erroneous instruction cannot be ruled harmless." Miller v. Universal City Studios, 650 F.2d 1365, 1372 (5th Cir.1981).
 
 
 39
 The court's characterization of the individual defendants' actions as "legal actions" could only have left the jury with the impression that the judge had already determined that these individuals had done no wrong. Although the jury was later instructed on the legal standards to apply in reaching its verdict, the later instruction did not directly address the prior characterization of the individual defendants' actions as "legal." We cannot therefore be absolutely certain that the jury was not misguided by the district court's words and actions. Consequently, we hold that the district court's statements constituted prejudicial error.
 
 
 40
 C. Directed verdict on Title VII, section 1983 racial discrimination--insufficiency of evidence
 
 
 41
 A Title VII plaintiff has the initial burden to establish a prima facie case of racial discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Subsequently, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employer's actions.[12] Id. Appellants asserted a defense of "business necessity" as their nondiscriminatory reason for firing Busby. However, a defendant may not assert a business necessity justification for its actions merely as a pretext for discriminatory conduct. See id. at 804, 93 S.Ct. at 1825. Nevertheless, in order to prevail over a defendant who has raised a "business necessity" defense, a plaintiff must prove that the nondiscriminatory reason for termination offered by the defendant was merely pretextual or discriminatorily applied. See id. at 806, 93 S.Ct. at 1826.
 
 According to our circuit's precedent:
 
 42
 Section 1983 actions challenging racial discrimination under the equal protection clause and Title VII disparate treatment cases both require a showing of discriminatory motive, and the nature of a prima facie showing is the same in either case: "... simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."
 
 
 43
 Lee v. Conecuh County Bd. of Educ., 634 F.2d 959, 962 (5th Cir.1981) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 579-80, 98 S.Ct. 2943, 2950-51, 57 L.Ed.2d 957 (1978)). Moreover, the McDonnell Douglas formulation of the parties' burdens applies to section 1983 racial discrimination claims as well as to Title VII claims. Id. at 963 (applying McDonnell Douglas to section 1983 claims).
 
 
 44
 The defendant City of Orlando articulated a legitimate, nondiscriminatory reason for Busby's firing, claiming that she was insubordinate. In support of its assertion, defendant offered evidence that Busby had refused to follow the department's policy of reporting allegations of misconduct to internal affairs prior to any disclosure to the public. It also showed that she had refused to follow orders surrounding her notice of that policy. However, despite the nondiscriminatory reason offered by defendant, the court erred in finding that Busby had not provided sufficient evidence of pretext to avoid a directed verdict against her.
 
 
 45
 In reviewing the district court's grant of a directed verdict on the basis of insufficient evidence, we "should consider all of the evidence ... in the light and with all reasonable inferences most favorable to the party opposed to the motion." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc). If substantial evidence opposed to the motion exists, i.e., "evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions," a directed verdict is improper. Id. A directed verdict is proper only "[i]f the facts and inferences [viewed in favor of the party opposing a motion for directed verdict] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at contrary verdict." Id. We believe that a review of the record shows that Busby did offer substantial evidence to show that the defendants Paden, Mays, Noble, and the City of Orlando by its employees, discriminatorily applied sanctions against Busby based upon her race.[13]
 
 
 46
 In reaching this determination, it is necessary to look at the entire series of investigations into Busby's conduct prior to her termination. A review of these investigations reveals that the incidents could reasonably be perceived to be related. The importance of showing a relation among the incidents is crucial to Busby's ability to prove that the OPD discriminatorily applied disciplinary measures to her.
 
 
 47
 The City of Orlando has a progressive disciplinary policy; under such a policy, Busby would not likely be fired for her actions in a single isolated incident, but only after receiving a series of recorded reprimands or suspensions. (R9:20-22). The evidence presented at trial clearly showed that she was fired not only for inappropriately disclosing her complaints about superiors to those outside the department or even for her refusal to sign the letter explaining the policy (as defendant suggests), but also for her cumulative acts.[14]
 
 
 48
 Four separate investigations were made into Busby's work-related behavior. All of the investigations occurred during the five-month period from April 1986 to August 1986. Lieutenant Noble instigated each of the investigations. Though the investigations were inquiries separate unto themselves, they involved a series of interrelated actions by Busby and her superiors.
 
 
 49
 The first investigation arose out of Busby's attempted solicitation of funds for the veterans' organization that she was attempting to found. She was charged with violation of the departmental regulation requiring "Obedience to Laws, Regulations & Orders," using her position to solicit, and conduct unbecoming an officer. Sergeant Scoggins led the investigation into the charges and filed his report on April 15, 1986. (See Defendant's Exhibit 19). According to Scoggins's report, Sergeant Moore had initiated a separate criminal investigation into Busby's solicitation of funds. When Moore discovered that she had not appropriately registered her organization or obtained a permit to solicit funds in accordance with state and City laws, he contacted the state attorney general's office. That office, however, declined to prosecute and suggested that the matter be pursued within the police department's disciplinary system instead. Busby, apparently angered by Sergeant Moore's accusations, wrote two letters to the Mayor, one on February 22, 1986, and the other on March 7, 1986, alleging that certain of the sergeants at the airport were "coffee-drinking, doughnut-eating" adulterers.
 
 
 50
 Scoggins's report concluded that Busby had violated the departmental regulation requiring "Obedience to Laws, Regulations & Orders" in that she had not complied with state and City law prior to beginning her solicitation drive and therefore "sustained" that charge. Scoggins "exonerated" Busby on the solicitation charge, however, because he found that the content of the solicitation letters did not reflect that she was attempting to use her position to solicit funds. Finally, because he found the accusations in the letters to the Mayor baseless, he "sustained" the charge of conduct unbecoming an officer. Noble then served Busby notice of a written reprimand for violation of the departmental regulation requiring "Obedience to Laws, Rules & Orders," and a forty-hour suspension for conduct unbecoming an officer on April 25, 1986. (See Defendants' Exhibit 19; R4:90).
 
 
 51
 In the second investigation, which again was prompted by Noble, Busby was initially charged with untruthfulness, failing to report violations of regulations by fellow officers, and insubordination. Officer Vereen, an Internal Affairs investigator, conducted the inquiry and filed his report on July 15, 1986. (Defendants' Exhibit 18). According to Vereen, on May 23, 1986, Busby told officers Edwards, Andrisen, and Jones that she had heard that Captain Paden had maligned her by calling her a "black bitch" and that she believed that Paden was out to get her. She also said that she was thinking of suing Noble because when she had complained about having to ride the golf cart, in spite of her medical excuse, he told her that she could go find another job. Vereen found that the charge for untruthfulness was "not sustained" because he could not establish the truth or falsity of her statement regarding what Paden had called her, and because it was clear that Busby believed her statement regarding Paden's slur to be true. In regard to her failure to report violations of regulations, Vereen concluded that Busby should be "exonerated" because he found that an officer's decision to report a fellow officer's derogatory statement directed toward her personally is the officer's personal decision and not one compelled by the regulations. Vereen also found Busby "exonerated" on the insubordination charge. Noble had based this charge on the belief that, in the written reprimand that had resulted from the first investigation, he had given her a direct order not to make negative statements about her superiors. Noble felt that Busby's complaining about her superiors on May 23, 1986, was a violation of that direct order. Vereen found, however, that the prior written reprimand did not give Busby such a directive. On July 28, 1986, Noble took issue with Vereen's report by writing a lengthy memorandum to the Chief of Police explaining that he believed the charge of insubordination should be sustained and that Busby should be terminated.
 
 
 52
 During this second investigation, on May 29, 1986, Busby wrote a letter in which she criticized various superiors and sent one copy to Major Mays and another to an individual in the personnel office. Once again, because Busby should have gone through internal channels, pursuant to OPD policy, the charges in the second investigation were amended to include a charge of conduct unbecoming an officer in connection with the critical letter. At Mays's direction, an employee of the personnel department assisted in the investigation of this charge. Mays himself sustained the charge of conduct unbecoming an officer and issued Busby a written reprimand, directing her not to continue to complain about her superiors outside the department anymore. Mays's reprimand is dated August 11, 1986. (Defendants' Exhibit 18; R9:67).
 
 
 53
 The third investigation involved the golf cart incident in which Noble again charged Busby with insubordination. The investigation was again conducted by Vereen. The incident occurred on June 6, 1986, and Vereen filed his report on August 11, 1986. (See Defendants' Exhibit 17). According to that report, Busby suffered physical reactions to the fumes emitted by the gasoline-powered cart. She obtained a medical report on March 3, 1986, stating that she should not be exposed to the fumes. For three to four weeks, she was not assigned to cart duty. Noble, Paden, and Mays then conferred. (R9:70-73). They decided that the medical excuse was not clearly worded and that if Busby could not ride the cart she should not be an ASO. Despite the medical excuse, the three decided to assign her to cart duty. It appears that when she was asisgned to cart duty, Busby attempted to deal with the situation by carrying out her duties on foot as much as possible instead of riding the cart. On June 6, 1986, one of the sergeants discovered that Busby was not riding the cart as assigned and confronted her. She refused to ride the cart, giving as her reason that she had a medical excuse. Vereen "exonerated" Busby of the insubordination charge because her medical excuse was bonafide, the order to ride the cart was improper, and an officer is allowed to disobey an improper order that would endanger her health in a nonemergency situation. Noble dissented from Vereen's conclusion on August 22, 1986, stating that he would have found the charge "not sustained" rather than "exonerated." Mays concurred with Noble on August 29, 1986.
 
 
 54
 The fourth investigation, which involved events occurring on July 21, 1986, was devoted to two charges against Busby raised by Noble. This time the investigation was conducted by Internal Affairs Officer Rauth. Rauth filed his report on the first charge, unauthorized absence, on August 7, 1986. (Defendants' Exhibit 16). According to his report, on July 21 Noble called Busby at home and told her she was an hour late to work. She came to the airport, arriving two hours and fifteen minutes after her scheduled time of arrival. Her excuse was that she had understood that July 21 was her day off, though she admitted that she had not read the schedule closely. Rauth concluded that the charge of unauthorized absence should be "sustained." Noble recommended that the discipline for this violation be termination. Rauth filed his report on the second charge, insubordination, on August 19, 1986. According to his report, after Busby had been at work for a few hours on the same day, Noble called her into his office and presented her with a letter written by Major Mays which explained the department's policy requiring that employees voice complaints about their superiors through channels rather than to outsiders. The letter had a space at the bottom of it for Busby to sign that she had "received, read and understood this order." Busby read the letter but refused to sign it, stating that she believed that she had a right to have an attorney or a union representative present if she was going to sign anything. Noble then conferred with Paden and Mays. They agreed that Busby had no right to a union representative or an attorney and that Noble should call Busby back into his office and give her another chance to sign. Noble brought Busby back into his office, this time with Officers Burleson and Andrisen present as witnesses. Noble read the letter to her, and Busby stated that she understood it. Noble ordered her to sign the document. She again refused. Noble informed her that she was charged with insubordination and suspended her from duty. He then wrote "stated she understood" on the letter and had the two officers sign as witnesses.
 
 
 55
 Rauth concluded that the charge of insubordination should be "sustained." Noble recommended that her discipline for this violation be termination. Mays concurred in Noble's recommendation and on August 29, 1986, imposed the discipline of termination, stating that "since these violations are in themselves serious breaches of our discipline standards and are part of a cumulative record of sustained violations that has reached an intolerable point, I am terminating the employment of A.S.O. Annie Busby." After a grievance hearing on October 1, 1986, Chief Walsh upheld Rauth's findings and the discipline of termination for the insubordination charge, but reduced the discipline for the unauthorized absence charge to a written reprimand. (Defendants' Exhibit 16).
 
 
 56
 Upon review of these investigations, it seems reasonable to conclude that they are not discrete, isolated, or unrelated. The "black bitch" incident, which gave rise to the second investigation, occurred in the midst of the investigation for soliciting funds. The critical letter Busby wrote to the Mayor on May 29, 1986, which precipitated Mays's amendment to the charges of the second investigation, was written during the "black bitch" investigations. Mays's written reprimand for the charge of conduct unbecoming an officer, which he added to the charges in the "black bitch" investigation, was issued on August 11, 1986, the same day that Vereen "exonerated" Busby on the charges arising out of the golf cart investigation. On July 18, 1986, three days after Vereen declined to "sustain" any of the charges related to the "black bitch" investigation, Mays wrote the letter explaining the regulations on complaining about superiors, the letter which led to the confrontation on July 21. Finally, Mays concurred in Noble's dissent as to Busby's exoneration in the golf cart investigation on August 29, 1986, the same day that he officially terminated Busby for her actions related to the final investigation. Though it may have been possible for Mays to have terminated Busby for the violations occurring on July 21 alone (see supra subsection B.1.), by his own admission, that is not what he did. In his written order terminating her, he stated that he was imposing the discipline of termination because her actions were part of a "cumulative record" of violations which he described as "intolerable." (Defendants' Exhibit 16).
 
 
 57
 It is therefore reasonable to conclude that if Busby showed at trial that any part of this disciplinary process was racially motivated, she provided evidence that the defendants' claim that her termination was a "business necessity" was pretextual. Busby indeed put on such evidence. She testified at trial that white employees with medical complaints about the golf carts had been reassigned to duties not requiring that they ride in the carts. (R5:73-74). One of those employees, Cathy Turnbeaugh, also testified, stating that she had been given "light duty on the desk" instead of cart duty on five separate occasions when she had medical difficulties. (R Supp.2:16). Busby also testified that she was given the longer, more strenuous shift assignments and was not allowed work rotations that were less physically taxing and might allow her to work without riding the carts, whereas white employees were routinely assigned to such rotations. (R4:125-27). Busby also testified that she had personal knowledge that four white employees who sold items or solicited either for personal profit or on behalf of an organization while on the job at the airport were not charged or investigated for their activities. (R4:55-59). Busby further testified that on July 21, when she was two hours and fifteen minutes late, she requested that Noble allow her to "make up the time," i.e., use time she had accumulated for sick leave and emergencies to make up for the hours she had been absent. (R5:85). He refused even though it was apparently common practice for him to allow white employees to do so and even though she had never before been reprimanded for tardiness or for taking unauthorized leave. (R5:85-86). From this evidence it is possible to infer that Busby was treated differently from white employees and that the events leading up to her termination were racially motivated in spite of the defendants' proffered reason for her termination. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir.1984) (stating that a Title VII plaintiff may establish her case by showing a differential application of disciplinary rules).
 
 
 58
 The evidence of discriminatory intent becomes even stronger when one considers the evidence of racial slurs used in Busby's presence. In addition to the evidence of Paden's use of racial epithets, Busby testified that five different officers used the word "nigger" or told racially derogatory jokes in her presence on several different occasions. (R5:57-67). One of those officers, Burleson, who served as one of Noble's witnesses on July 21, also told Busby he was a member of the "KKK." (R5:67). Moreover, Busby further recounted one occasion on which Burleson used racial epithets toward her in front of Noble, and Noble did nothing to reprimand Burleson. (R5:60). In addition, in the latter part of June 1986 Busby found stickers on her locker displaying the word "nigger." Busby's testimony that officers used racial slurs and did so in front of superiors was corroborated by the testimony of a black co-worker. (R Supp.3:111-15). Viewing the above evidence and the inferences drawn therefrom in a light most favorable to Busby as required by the Boeing standard, it is entirely possible for reasonable jurors to conclude that Busby had been racially harassed and discriminatorily discharged, and that the defendants' "business necessity" justification for their actions was pretextual. Therefore, the district court erred in awarding a directed verdict on Busby's section 1983 racial discrimination claim against Noble, Paden, and Mays in their individual capacities, and on Busby's Title VII claim against the City of Orlando.[15]
 
 
 59
 However, we believe that the district court correctly granted a directed verdict in favor of Chief Walsh. The Boeing standard requires "substantial" evidence opposing a motion for a directed verdict to warrant reversal on appeal. Boeing, 411 F.2d at 374. Substantial evidence is more than a "mere scintilla"; it is "evidence of such quality and weight that reasonable and fairminded [persons] in the exercise of impartial judgment might reach different conclusions." Id. We simply find that Busby has failed to offer sufficient evidence to warrant reversal of the directed verdict in favor of Chief Walsh. Although Busby did tie Walsh to the chain of command that caused her termination and the other discriminatory acts against her, a supervisor cannot be held liable on the basis of respondeat superior for the acts of his inferiors under section 1983. See Monell, 436 U.S. at 691, 98 S.Ct. at 2036. Though we recognize that a supervisor's liability is not limited solely to those incidents in which he personally participates, Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir.1985), and that he can be held liable if a causal connection is shown between his actions and the deprivation of the plaintiff's constitutional rights, id., no such connection was shown by substantial evidence in this case. We recognize that Busby offered evidence to show that Walsh was aware of racial discrimination complaints generally at the airport, and that he was aware that officers had used racial epithets. Though no written policy prohibiting the use of racial slurs existed at the OPD, we feel that the evidence of Walsh's failure to enact such a policy, even in light of his awareness of general complaints and the use of racial epithets, does not constitute sufficient evidence for reversal. Such evidence, without more, does not constitute substantial evidence such that reasonable minds could disagree as to whether a causal connection existed between his actions and the deprivation of Busby's rights. Accordingly, we AFFIRM the district court's holding on this point.
 
 II. Evidentiary Issues
 
 60
 A. Expert testimony, statistical summaries, and graphs
 
 
 61
 Busby appeals the district court's decision to exclude her expert witness's testimony. Busby attempted to qualify Charles English, a psychological counselor, as an expert and then tendered him to testify on statistics reflecting racial bias in the City's and police department's employment practices, as well as the psychological impact the alleged discrimination had on Busby. The defendants asked the court to rule that English was not qualified to testify as an expert. The court, however, made no ruling on English's qualifications. Instead, the court decided that sufficient evidence already existed in the record for the jury to decide whether Busby had been subjected to racial discrimination, and that the jury was fully capable to consider, without the aid of expert testimony, the matters about which English was tendered to testify.
 
 
 62
 The statistical information English would have presented involved the explanation of several exhibits that were also excluded when English was barred from testifying. One of those exhibits, number 37, depicted information regarding the disproportionate percentage of blacks terminated between 1980 and 1986 by the OPD.[16] This information was highly relevant to showing a custom or policy of discrimination on the part of the department as required to establish Busby's racial discrimination claims against the City of Orlando. See Monell, 436 U.S. at 691, 98 S.Ct. at 2036. The district court stated that the only fact that the jury had to determine was "whether or not the plaintiff was terminated from the Orlando Police Department solely or substantially because of her race. I feel that the jury, from the numerous bits of evidence and documents and testimony that they have, the jury is fully capable to do that without the assistance of any expert testimony...." (R10:177).
 
 
 63
 Our review of the record, however, has not revealed any other information of this kind establishing a custom of termination based on race. What was already admitted into evidence was the raw data from which the percentage of terminations within each race was calculated. (Plaintiff's Exhibit 22). This raw data, or "termination logs," consisted of a sheet of paper photocopied from a record book for each of the thirteen employees terminated between 1980 and 1986. (R10:102). The page representing each employee contains: the employee's name; the department; the date; the reprimanding officer; whether the employee has a bargaining unit, and if so, which one; whether the reprimand issued stated the number of previous written reprimands; the offense for which the current reprimand is issued; the disciplinary action taken (in this case termination); and, a blank labeled "R/S Code."[17] The "R/S Code" is the indicator of the employee's race and sex. However, the only way to interpret the letter placed in the "R/S Code" blank is to refer to a separate key that was also admitted into evidence. (Plaintiff's Exhibit 53, R:10:108). The key states that "A" stands for "W/M," presumably meaning "white male," "B" stands for "B/M," presumably meaning "black male," "C" stands for "H/M," presumably meaning Hispanic male, etc. Some of the sheets of paper, however, do not tell the "R/S Code" of the employee. The testimony at trial indicated that the researchers gathering the information on these employees were able to discover the race of the employees whose "R/S Code" blank was not filled in by going to separate files kept by the City. (R10:104). These files were not in evidence. Busby attempted to introduce into evidence a summation of the raw data prepared by the researchers. This summation listed the names of those terminated by year and race. (Plaintiff's Exhibit 61). The district court excluded the summation as cumulative. (R10:115). The excluded exhibit 37, which the expert would have explained, was a graph that similarly summarized the number of employees terminated by year and race and further contained a statement regarding the percentage of those terminated who were black. Absent such summary and explanation, the jury was thus left with the incomplete raw data alone with no way to summarize it or discern its meaning accurately.
 
 
 64
 Fed.R.Evid. 403 allows the district court to exclude otherwise admissible evidence because its "probative value is substantially outweighed by ... considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. The district court's decision to exclude evidence on the basis of Rule 403 should not be overturned absent abuse of discretion. United States v. De Parias, 805 F.2d 1447, 1454 (11th Cir.1986), cert. denied, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). Rule 403 is, however, "an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." United States v. Betancourt, 734 F.2d 750, 757 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). "In the normal evidentiary sense cumulative evidence is excluded because it is repetitious." Brown v. Wainwright, 785 F.2d 1457, 1466 (11th Cir.1986). We cannot say that the summary and graph are repetitious because they provided information that even the most competent jury could not have arrived at by an examination of the original documents. We therefore view the total exclusion of evidence interpreting the termination log sheets as an abuse of discretion.
 
 
 65
 The decision on whether to allow an expert to testify is also within the discretion of the trial court. United States v. Elkins, 885 F.2d 775, 786 (11th Cir.1989) (citations omitted), cert. denied, --- U.S. ----, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). Expert testimony is admissible if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The standard, then, is assistance to the trier of fact. United States v. Roark, 753 F.2d 991, 994 (11th Cir.1985). To the extent that the expert's explanation of this statistical exhibit would have assisted the jury in understanding it, his testimony should have been admitted along with the exhibit.
 
 
 66
 Moreover, the expert's testimony regarding the psychological impact of the termination on Busby is directly relevant to the issue of damages. This testimony should therefore have been admitted as well. No other testimony regarding the psychological impact that the alleged discrimination had on Busby is contained in the record on appeal. Without this testimony it would not be possible for the jury to assess the damages to which Busby may have been entitled as a result of the injuries she allegedly suffered under the section 1983 claim.
 
 
 67
 However, we affirm the district court's decision to exclude the termination logs and graphs pertaining to non-OPD employees of the City of Orlando. Busby's Section 1983 count and Title VII count against the City of Orlando claimed that the City had a custom or policy of depriving blacks of their civil rights. However, she did not allege facts to prove that the entire City of Orlando had a policy of racial employment discrimination; she alleged only facts to prove that the City of Orlando had a custom or policy of discriminating against black officers of the OPD.
 
 
 68
 Busby introduced into evidence, in addition to the OPD termination logs, non-OPD City organization termination logs. Busby also attempted to introduce a graph depicting City-wide terminations. The district court struck the previously introduced non-OPD termination logs and excluded the graph depicting City-wide terminations as irrelevant.
 
 
 69
 We agree with the district court's decision to exclude the non-OPD City of Orlando graph and termination logs. Under the relevant standard of review, a district court's decision regarding relevancy will not be overturned absent a showing of abuse of discretion. United States v. Russo, 717 F.2d 545, 551 (11th Cir.1983) (per curiam); United States v. Kopituk, 690 F.2d 1289, 1319 (11th Cir.1982), cert. denied, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). In Busby's complaint, she did not allege that the entire City of Orlando had a policy of racial employment discrimination; she alleged only that the City of Orlando had a custom or policy of discriminating against black officers of the OPD. The Joint Pre-Trial Stipulation by the parties made no mention of any factual allegations regarding a City-wide employment discrimination policy. Additionally, we can find no discussion in the record regarding any alleged discriminatory policy by non-OPD City organizations. Therefore, we hold that the district court did not abuse its discretion in excluding such evidence as irrelevant to the issues joined for trial.
 
 B. Environment of racial harassment
 
 70
 The district court excluded testimony by one of Busby's witnesses. The witness claimed to have heard racial slurs, referring to Busby, made by OPD employees other than Paden. This proposed testimony was offered to show that Busby was subjected to an atmosphere of racial harassment and discrimination while on the job.
 
 
 71
 Busby appeals this ruling on the basis of Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1423 (7th Cir.1986) (evidence of racial epithets admissible under Fed.R.Evid. 403 to show racially hostile work environment). Although "[a]n employer 'is not charged by law with discharging all Archie Bunkers in its employ,' " Id. (quoting Howard v. National Cash Register Co., 388 F.Supp. 603, 606 (S.D.Ohio 1975)), "when [the racial slurs] are so egregious, numerous, and concentrated as to add up to a campaign of harassment" the employer is "culpable for failing to discover what is going on and to take remedial steps." Id. at 1422. The decision whether to admit or exclude testimony under Rule 403 regarding racial slurs not directly made by supervisors or not made in the plaintiff's presence is within the district court's discretion. See id. at 1423; see also Worsham v. A.H. Robins Co., 734 F.2d 676, 686 (11th Cir.1984) (stating that our task is to "search through the trial record to see if the judge's decisions about the relevance and materiality of the evidence were arguably proper").
 
 
 72
 Although the district court has broad discretion with respect to this issue, we find that this testimony goes directly to the issue of racial harassment on the job, in light of Rogers v. E.E.O.C., 454 F.2d 234 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). In Rogers, this court found admissible evidence offered to show "a working environment heavily charged with ethnic or racial discrimination" as relevant to the issue of on-the-job racial harassment and discrimination against a particular individual. Id. at 238. Moreover, our circuit has held that "[t]he fact that many of the epithets were not directed at [the plaintiff] is not determinative" of whether a work atmosphere is polluted with racial discrimination. Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n. 2 (11th Cir.1982). We recognize that the district court excluded the testimony because it felt that if Busby did not hear these slurs or if they were not directed toward her then she could not have experienced harassment as a result of them. Nevertheless, we hold that, in light of Rogers and Walker, the district court abused its discretion in excluding such evidence.
 
 C. Internal affairs report
 
 73
 In order to buttress her case that Paden had unlawfully brought about her termination, Busby sought to introduce an OPD Internal Affairs Investigation Report. This report was prepared following an investigation into Paden's alleged extramarital affairs. Although the investigation was not completed until after Busby's termination, apparently the report concluded that Paden was in fact having an affair during the time that Busby was employed by the OPD and allegedly confronted Paden about his supposed extramarital affairs with subordinates. The district court refused to admit the report or any testimony discussing the report on the grounds that it was irrelevant. We disagree. We recognize that under the relevant standard of review, a district court's decision regarding relevancy will not be overturned absent a showing of abuse of discretion. Russo, 717 F.2d at 551; Kopituk, 690 F.2d at 1319. Nevertheless, we believe the district court abused its discretion in excluding the report.
 
 
 74
 In our opinion, evidence showing that Busby's allegations regarding the illicit affairs of her supervisor were truthful, rather than false as investigations into her actions had previously found, is extremely relevant to both the issue of her credibility and to whether or not the explanations given by the defendants were pretextual. We therefore hold that the district court abused its discretion in excluding the report.
 
 D. Brinson and Jarboe testimony
 
 75
 Additionally, Busby appeals the district court's exclusion of testimony from one of Busby's black co-workers, Joyce Brinson, as irrelevant. Busby sought to use Brinson's testimony to establish a City custom or policy of racial harassment and discrimination at the OPD by showing that OPD officers had racially harassed and discriminated against Brinson. Busby alleged that a white co-worker, Joanne Jarboe, was given preferential treatment to the detriment of Brinson. The district court refused to allow Brinson to testify about the discipline she received from Paden. The court did, however, allow Brinson to testify that she in fact had been racially harassed by OPD officers, specifically Captain Paden, and that such harassment was the reason that she resigned from the OPD.
 
 
 76
 As to Brinson, we again disagree with the district court, and find an abuse of discretion. Busby's claim is that the City had a policy of employment discrimination, and that it had a policy that permitted racial harassment. In establishing a custom or policy of discriminatory firing or discipline, the plaintiff may show that her actions and the consequent reactions of her supervisors were not unique to her, but that others of her protected class were similarly treated while those not within her class were not fired or disciplined in the same manner. See, e.g., Nix, 738 F.2d at 1185. Although Brinson was allowed to testify that she was racially harassed on the job, the details of Brinson's experience with Paden are also highly relevant to Busby's establishment of her claim. We therefore see no proper reason for excluding this testimony.
 
 
 77
 The court also refused to allow Jarboe to testify that she received preferential treatment to Brinson's detriment. Busby asserts that Jarboe's testimony is relevant to support her claim that she was disciplined for exercising her free speech in a memo she wrote to her superior. The actual memo was admitted into evidence. Yet, we have no proposed testimony to review regarding Jarboe's testimony with respect to the memo, because Busby failed to make a proffer of Jarboe's testimony. See Fed.R.Evid. 103(a)(2); see, e.g., Finch v. City of Vernon, 877 F.2d 1497, 1504 (11th Cir.1989) (appellant failed to identify evidence excluded). Because we have no proffered testimony before us to review, we have nothing to decide with respect to this issue.
 
 
 78
 Busby also sought to show that a white co-worker was charged with insubordination, yet was not terminated. The court also excluded this evidence. However, because the proposed testimony was never proffered, we have no means to determine whether or not the trial court acted within its discretion.[18]
 
 E. Lovett testimony
 
 79
 Busby contends that the district court erred in not allowing testimony by Lt. Lovett to establish an OPD policy of disciplining "whistleblowers." She claims that Lovett was transferred from airport duty for complaining about Paden's extramarital affairs. The district court did allow into evidence a letter from Chief Walsh to Major Mays which stated Lovett's complaints fairly clearly (Plaintiff's Exhibit 108), but it refused to allow Lovett to testify about specific complaints regarding racial harassment of employees other than Busby. Lovett was permitted to testify that he was transferred and that he indeed had complained about certain problems at the OPD. Upon a careful reading of Exhibit 108, Lovett's complaints appeared to relate to "low morale" resulting from "perceptions" that certain people were "more interested in certain females" than in their duties. We think that the district court was probably correct in ruling that such testimony would be irrelevant; in any event, however, because Busby has failed to proffer any of Lovett's testimony, we have no means to determine as a matter of law whether the district court erred.
 
 F. Exhibit 93
 
 80
 Busby finally claims that the district court erroneously excluded Plaintiff's Exhibit 93, a large collection of documents relating to Lovett's complaints. Included in this hodgepodge of documents is the memo from Chief Walsh to Major Mays which was admitted into evidence as Plaintiff's Exhibit 108. The rest of the collection includes letters and memos regarding the complaints, including a response to the complaints by Captain Paden. Although these documents might make interesting reading, we do not believe that the district court abused its discretion in excluding the exhibit as irrelevant, cumulative, and possibly confusing to the jury. The sheer volume of the exhibit, its limited probative value (i.e., to show that an employee was disciplined for complaining), and the fact that the memo describing Lovett's complaints was admitted into evidence lead us to this conclusion.[19]
 
 III. Attorney's fees
 
 81
 Although a majority of this panel believe that Chief Walsh is entitled to a directed verdict, we strongly note that this is a most difficult case. Accordingly, under the law of our circuit, the award of attorney's fees is inappropriate. Under 42 U.S.C. Sec. 1988, the district court may award attorney's fees to prevailing parties in section 1983 actions only where " 'the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.' " Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) (quoting Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978)). The Supreme Court has described this standard as a "stringent" one. Id. The standard is so stringent that "[t]he plaintiff's action must be meritless in the sense that it is groundless or without foundation" in order for an award of fees to be justified. Id. "The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees." Id. Our circuit has held that the plaintiff's section 1983 claims should not be considered groundless or without foundation for the purpose of an award of fees in favor of the defendants when the claims are meritorious enough to receive careful attention and review. O'Neal v. DeKalb County, Ga., 850 F.2d 653, 658 (11th Cir.1988) (holding that an award of fees in favor of a section 1983 defendant was not justified where there was some support in case law for the plaintiff's claims). The fact that one judge on this panel disagrees over the disposition of the directed verdict against Walsh demonstrates that this court has had to consider Busby's claims against him very carefully. Therefore, Busby's claim against Walsh was neither frivolous nor completely ungrounded. Accordingly, we VACATE the district court's award of attorney's fees in favor of Walsh.
 
 IV. Conclusion
 
 82
 In summary, we make the following rulings with respect to this case. We REVERSE the district court's decision granting directing verdicts in favor of Paden, Mays, and Noble in their individual capacities on the section 1983 racial discrimination claim, but AFFIRM its decision granting verdicts in favor of Chief Walsh in his individual capacity, and its decision granting verdicts in favor of all the individually named defendants as to the other claims. We also AFFIRM the court's grant of directed verdicts as to the officially named defendants, but REVERSE and REMAND the case against the City of Orlando because of prejudicial statements made during the jury charge regarding those directed verdicts. We also REVERSE the district court's decision on the following evidentiary issues: excluding the racial discrimination statistics regarding the OPD, and the corresponding graph; excluding the expert testimony of Charles English to explain those exhibits and to testify as to psychological impact on Busby; excluding Brinson's testimony; and excluding the introduction of the Internal Affairs Report corroborating Busby's accusations regarding Paden's extramarital affairs. We AFFIRM, however, the court's evidentiary rulings regarding Jarboe's and Lovett's testimony, and the exhibit containing the large collection of documents. With respect to the collection of documents, we strongly urge the parties to submit such evidence on retrial in a more organized fashion so that the court will be better able to rule on the evidence. We VACATE the court's grant of attorney fees to Walsh. Finally, we REMAND the case for proceedings consistent with this opinion.
 
 ALLGOOD, Senior District Judge, concurring:
 
 83
 When we first discussed this case, I told my learned brothers, both of whom I greatly admire and respect, that this case was full of problems. Various aspects of the case troubled me very much, including the fund raising scheme that Busby used.
 
 
 84
 After reading the briefs and hearing the oral arguments, it was my conclusion that we should affirm the district court with a short per curiam. However, I was open to the fact that after the entire record was reviewed, it might be necessary to reconsider my initial impression. Both Judge Fay and Judge Johnson have now, not only read, but studied the record thoroughly and are convinced that we cannot affirm.
 
 
 85
 I am bound by the law regardless of whether or not I approve of it. While I do not like the action we are taking, I yield to Judge Fay's judgment and interpretation of the law and concur in his opinion.
 
 JOHNSON, Circuit Judge, dissenting:
 
 86
 I do not agree that the district court correctly granted a directed verdict in favor of Chief Walsh on the section 1983 racial discrimination claim. I believe that Busby presented "evidence of such quality and weight that reasonable and fairminded [persons] in the exercise of impartial judgment might reach different conclusions." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969). Walsh was the chief policymaker of the department and ultimately had responsibility for supervision of the department. Though, as the majority points out, a supervisor cannot be held liable on the basis of respondeat superior under section 1983, he can be liable where there is "a causal connection between the actions of the supervisory official and the alleged deprivation." Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir.1985). This causal connection can be established by proof that the supervisor was aware or should have been aware of a problem which called for improved training or closer supervision, but nonetheless took no action. Id. There is no doubt that Walsh knew about the Busby investigations long before he became involved as a hearing officer. (See Plaintiff's Exhibit 108). Walsh was also aware of complaints of racial discrimination from airport employees. (R8:45-46). Moreover, he was aware of the use of racial epithets by officers. (R8:22-23). Yet, there existed no written policy prohibiting the use of racial slurs, and to Walsh's recollection he never disciplined an employee for using racial slurs or for racial discrimination during his tenure. (R8:33, 43-44). In my opinion, Busby presented substantial evidence showing a causal connection between the discrimination Busby alleges to have suffered and Walsh's actions or inactions. Under the Boeing standard, I believe this evidence to be substantial enough to avert a directed verdict. I therefore dissent on this issue.
 
 
 
 *
 Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 The veterans' fund proposal, according to Busby, was to create a veterans' home (at her own home). Busby had not set up any separate method for accounting or safekeeping the charitable funds. Instead, she merely requested that checks be made out to her personally
 
 
 [2]
 As per OPD policy, the internal affairs division investigated Busby's complaints, each within a reasonable time after they were made, but failed to find any evidence to support them. However, subsequent to Busby's termination, the internal affairs division did conclude, following an investigation into complaints by OPD employees other than Busby, that Paden had been participating in extramarital affairs during the time that Busby was employed at OPD
 
 
 [3]
 The statistics, discussed infra, were OPD and City of Orlando personnel records concerning employees who had been terminated from employment. On each of these records, or termination logs, each employee's race was listed using a code. From these records, graphs had been formed to show the number of blacks terminated versus the number of whites terminated
 
 
 [4]
 Although Busby's complaint is rather unartfully drafted, we believe that it does assert an equal protection claim under section 1983. Count I, which is headed "Title VII of the Civil Rights Act of 1964," alleges various forms of racial harassment and discrimination, stating, inter alia, that the city had a "custom of terminating black employees like Plaintiff who blow the whistle on Orlando Police Department employees who are engaged in illegal or immoral activities." (R1:1:10). Count II of the complaint, on the other hand, which is entitled "42 USC Section 1983 and Fourteenth Amendment," speaks solely of Busby's liberty interest in her reputation and her property interest in her job in alleging the violation of her due process rights. (R1:1:10-11). Count IV of the complaint, however, which bears the nebulous heading "Wrongful Termination in Violation of Public Policy, Termination of a Whistle Blower," alleges in language similar to that of the Title VII claim in Count I that "Defendants acting under color of law have a policy, practice or custom that deprives employment to black employees who 'blow the whistle' on employees who are engaged in wrong doing." (R1:1:12)
 Though Count IV does not bear the heading "Section 1983 claim," Busby has alleged in it the basic elements of a prima facie section 1983 action. She has claimed deprivation of her job under color of law on the basis of her race. It is only reasonable to read this language as alleging deprivation of a property right by one acting under color of state law in violation of the equal protection clause of the fourteenth amendment. See, e.g., Bannum, Inc., v. City of Fort Lauderdale, 901 F.2d 989, 996-97 (11th Cir.1990) (stating that a section 1983 action requires a showing of (1) a deprivation of a constitutional right, privilege, or immunity, (2) under color of state law).
 This circuit has required somewhat more specific pleading from section 1983 plaintiffs than from plaintiffs bringing other kinds of actions. Arnold v. Board of Educ. of Escambia County, Ala., 880 F.2d 305, 309 (11th Cir.1989) (stating that the need to protect public officials from nonmeritorious claims requires a higher level of specificity in pleading). It is clear, however, that the central requirement for a complaint is that it must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). In our opinion, Count IV of Busby's complaint was sufficient to give the defendants notice that Busby intended to pursue a section 1983 claim on the ground of racial discrimination.
 Moreover, the record clearly shows that the defendants were fully aware that Busby intended to raise claims of racial discrimination under section 1983 as well as under Title VII and section 1981. The parties filed a joint pretrial stipulation expressing their view of the nature of the case, areas of agreement, and facts remaining to be litigated. In that document, the parties agree that Count IV is "an attempt to hold the Defendants individually liable under 42 U.S.C. Sec. 1983." (R2:34:2). Such voluntarily submitted pretrial stipulations are generally considered binding. See, e.g., Feazell v. Tropicana Prods., Inc., 819 F.2d 1036, 1040 (11th Cir.1987). In addition, in the section entitled "Plaintiff's Issues of Fact Remaining to be Litigated," the same document states that an issue to be addressed at trial is "[w]hether during her employment the Plaintiff was the subject of racial harassment or racial slurs to an extent where she may have a cause of action against the Defendant City of Orlando under 42 U.S.C. Sec. 1983 and 1981." Under "Defendants' Issues of Fact Remaining to be Litigated," similar language appears, stating that a remaining issue of fact is "[w]hether during her employment the Plaintiff was the subject of racial harassment or racial slurs to an extent where she may have a cause of action against the Defendants under 42 U.S.C. Sec. 1983 or 42 U.S.C. Sec. 1981." (R2:34:34). Therefore, the parties clearly mutually understood Busby to be alleging racial discrimination through her section 1983 claim as well as through her Title VII and section 1981 claims, in spite of the fact that the original complaint was not succinctly worded. We are presented, then, with a claim in Count I under Title VII of the Civil Rights Act, a due process claim in Count II under section 1983 (which could be considered to include a substantive due process first amendment claim under section 1983), a first amendment claim in Count III, and an equal protection claim under section 1983 in Count IV.
 
 
 [5]
 42 U.S.C. Sec. 2000e-2 provides, in pertinent part:
 (a) Employer Practices
 It shall be an unlawful employment practice for an employer--
 (1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 42 U.S.C. Sec. 2000e-2 (1988).
 
 
 [6]
 Busby also sued under 42 U.S.C. Sec. 1981 for racial harassment and discrimination while she was employed at the OPD. In Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court limited actions under Section 1981 to exclude racial harassment and discrimination claims arising after contracts have been formed, i.e., Section 1981 is limited to actions for refusal to enter into a contract because of race. Busby's claim was for racial harassment and discrimination during her employment at OPD. Under Patterson, therefore, it would appear that her section 1981 claim is extinguished
 However, even if the section 1981 claim has not been extinguished, we need not address it separately from the section 1983 claim. The section 1981 claim has been effectively merged into the section 1983 claim for racial discrimination. This occurs because the "the express 'action at law' provided by Sec. 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by Sec. 1981 when the claim is pressed against a state actor." Jett v. Dallas Independent School Dist., 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989) (holding that section 1981 can provide no broader remedy against a state actor than section 1983 and that therefore a plaintiff bringing such a claim must show custom or policy within the meaning of Monell, cited infra, just as the section 1983 plaintiff would); see also Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir.1991) (declining to address the applicability of Patterson to a section 1981 claim and holding that any relief available under section 1981 was duplicative of that available under section 1983).
 
 
 [7]
 The Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [8]
 She also alleged substantive due process violations of her free speech rights in Count II under section 1983
 
 
 [9]
 Although Busby did not specifically state that Paden acted in order to hide the affairs, we think a reasonable inference can be drawn from her allegations that Busby claimed Paden had attempted to prevent her from revealing his affairs
 
 
 [10]
 Accordingly, if the regulations are reasonable, and the standard for determining good faith is objective, whatever Captain Paden's subjective motivation may have been for enforcing those regulations is irrelevant to whether he is entitled to immunity
 
 
 [11]
 For a discussion of Title VII official liability, see infra section I, subsection C of this opinion
 
 
 [12]
 However, this "burden of proof" is to be understood as a burden of production, not persuasion. Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 660, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733 (1989)
 
 
 [13]
 If such allegations were proved true, the City would, of course, be liable under Title VII for the actions of its employees. It would also be liable under section 1983 as the remaining named party for the actions of the other defendants in their official capacities. Defendants Paden, Mays, and Noble would be liable individually under section 1983
 
 
 [14]
 According to Major Mays's testimony on direct examination:
 Q. All right. Did you have anything to do with the discipline that Miss Busby received as a result of the failure to sign this order?
 A. Yes, sir.
 Q. And what was your involvement there?
 A. I was the disciplining authority.
 Q. And what do you mean by that?
 A. I was the one who made the final determination on discipline.
 ....
 Q. And was this done after the internal affairs investigation?
 A. Yes, sir.
 Q. And as part of the progressive discipline, did you consider the prior discipline that had been meted out to Miss Busby?
 A. Yes, sir.
 Q. And that was a factor?
 A. Yes, sir.
 Q. And what did you recommend?
 A. I recommended termination.
 (R9:93-94).
 
 
 [15]
 Both parties stipulated that the Title VII claim would be tried by the court, and not by the jury. Although the district court did not explicitly include the City of Orlando in its directed verdict, a review of the record leads us to the conclusion that the court must have granted the City of Orlando a directed verdict along with the other defendants. Neither Busby nor the City of Orlando requested an opinion or finding of fact by the court regarding the Title VII claim. Additionally, at the close of trial, a decision by the court was entered in addition to the verdict by the jury. Based upon these circumstances, we are led to the conclusion that the court must have directed a verdict in favor of the City of Orlando when it directed a verdict in favor of the other defendants at the close of Busby's case
 
 
 [16]
 Although blacks comprised only 11 percent of the employees in the police department, they comprised 69 percent of the employees fired. (See Plaintiff's Exhibit 37)
 
 
 [17]
 Some, but not all, of the forms also contain a blank for the employee's age
 
 
 [18]
 Busby argues that the court erred by not allowing her counsel to proffer the testimony, as well as several exhibits discussed elsewhere in this opinion. Although the court did refuse to allow a proffer at that moment, counsel certainly could have proffered the testimony at another point in the trial--the judge need not have been present. We most emphatically stress the duty of counsel to perfect the record on appeal. We cannot review those issues that are not properly raised before us, and, we are unsympathetic to appellant's argument to reverse the district court merely for its refusal to postpone ongoing proceedings
 
 
 [19]
 Because this case is being sent back to the district court for retrial, we strongly urge the parties to identify the specific documents more carefully so that the court will be better able to rule on the admissibility of each one