[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

Nos. 95-2565 & 95-3220

_____

D. C. Docket No. 91-762-CIV-ORL-19

TECHNICAL RESOURCE SERVICES, INC.,

Plaintiff-Appellant,

versus

DORNIER MEDICAL SYSTEMS, INC.,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(February 12, 1998)**

Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and LAY*,
Senior Circuit Judge.

ANDERSON, Circuit Judge:

_____
* Honorable Donald P. Lay, Senior U.S. Circuit Judge for the
Eighth Circuit, sitting by designation.

These consolidated appeals arise from a civil antitrust dispute which was the subject of two jury trials. We affirm the district court's entry of judgment for the appellee and, with one exception, affirm the district court's award of costs to the appellee.

I. FACTS

Appellee Dornier Medical Systems, Inc. ("DMSI") sells, supplies, and services Dornier lithotripters, which are manufactured by Dornier Medizintechnik, GmbH ("DMT"), DMSI's German parent company. Lithotripters are medical devices which dissolve kidney stones through the use of shock waves. Appellant Technical Resource Services, Inc. ("TRS") is an independent service organization which services lithotripters.

DMT invented the first lithotripter, the HM-3, in the early 1980's. This invention revolutionized the treatment of kidney stones by eliminating the need for invasive surgery. The next generation of Dornier lithotripters was the HM-4, which received FDA approval in 1987.[1] Both the HM-3 and the HM-4 remain in use, as does the MFL 5000, the HM-4's successor.

TRS contends that DMSI engaged in unlawful, anticompetitive conduct in order to maintain control of the servicing market for Dornier lithotripters and to prevent competition from TRS and

_____

[1] Since 1988, several other lithotripter manufacturers have received FDA approval.

2

other independent service organizations. TRS's allegations are as follows. TRS alleges that until 1989, DMSI's lithotripter sales contracts required Dornier lithotripter buyers to purchase a DMSI service contract, and that these service contracts automatically renewed from year to year unless the buyer notified DMSI that it wished to terminate the contract. TRS also alleges that DMSI used various tactics to maintain control of Dornier lithotripter spare parts. In particular, TRS contends that DMSI sold parts only to Dornier lithotripter owners and users. TRS also alleges that DMSI took special advantage of the HM-3's energy source, the shock wave generator. Rather than selling replacement shock wave generators, DMSI had an exchange program under which a shock wave generator that needed to be replaced would be exchanged with DMSI for a new one. TRS contends that DMSI's shock wave generator exchange program prescribed an arbitrarily short lifespan for shock wave generators, limited TRS's access to shock wave generators, and prevented TRS from performing both shock wave generator service and full HM-3 service.

The HM-3's successor, the HM-4, uses software for its operation and servicing. This software is copyrighted, and DMSI limits access to it. The gist of TRS's complaint regarding the HM-4 software is that DMSI has refused to provide TRS with the HM-4 diagnostic software and manuals, and that without these materials, it is cumbersome to perform service on the HM-4.

**3**

II.  PROCEDURAL HISTORY

TRS filed this lawsuit against DMSI on October 11, 1991, alleging violations of §§ 1 and 2 of the Sherman Act.[2]  TRS's claim under § 1 is a tying claim:  TRS contends that DMSI possessed power in the lithotripter market and unlawfully used this market power to force buyers of Dornier lithotripters to accept unwanted service contracts.  TRS thus claims that Dornier lithotripters are the "tying product" and service for Dornier lithotripters is the "tied product."  TRS also claims that DMSI violated § 2 of the Sherman Act by unlawfully monopolizing and unlawfully attempting to monopolize the service market for Dornier lithotripters.

Following contentious and protracted discovery and pre-trial proceedings, this case was tried to a jury beginning on May 13, 1993.  The Honorable Patricia C. Fawsett[3] presided over the seven week jury trial and submitted to the jury a special verdict form.  See Fed. R. Civ. P. 49(a).  Section I of the special verdict form contained three interrogatories regarding TRS's § 2 monopolization claim.  The jury wrote "No Decision" under each of

_____

[2] Section 1 of the Sherman Act states in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.

Section 2 of the Sherman Act provides in relevant part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.

[3] U.S. District Judge for the Middle District of Florida.

these interrogatories.  Section II of the special verdict form contained four interrogatories regarding TRS's § 2 attempt to monopolize claim.  The jury also wrote "No Decision" under each of these interrogatories.  Section III of the special verdict form contained interrogatories regarding TRS's § 1 tying claim. The jury responded to these interrogatories as follows:

8.  Has TRS proven by a preponderance of the evidence that there were separate markets for Dornier lithotripters, the tying product, and service for Dornier lithotripters, the tied product?

*No Decision*

Yes ___    No ___

9.  Has TRS proven by a preponderance of the evidence that DMSI possessed sufficient economic power in the lithotripter market to coerce the buyer to purchase service for Dornier lithotripters, the tied product?

Yes ___    No _X_

10. Has TRS proven by a preponderance of the evidence that DMSI forced the buyer to purchase the tied product?

Yes ___    No _X_

11. Has TRS proven by a preponderance of the evidence that the arrangement had an anticompetitive effect in the tied product market?

*No Decision*

Yes ___    No ___

12. Has DMSI proven by a preponderance of the evidence that the tying arrangement was justified by a legitimate business reason?

**5**

*No Decision*

Yes ___     No ___

Section IV of the special verdict form contained two interrogatories regarding injury and damages; the jury did not respond at all to those interrogatories.

Judge Fawsett polled the jury and determined that the jurors were unanimous in their decision as to interrogatories 9 and 10, but that they were unable to reach a decision as to the remaining interrogatories. Judge Fawsett then dismissed the jury. DMSI moved for judgment on TRS's § 1 tying claim based on the jury's answers to interrogatories 9 and 10. Judge Fawsett denied this motion, reasoning that the jury's failure to reach a decision on interrogatory 8 was fatally inconsistent with the jury's answers to interrogatories 9 and 10.

A new trial was scheduled, and this case was transferred to the Honorable Louis C. Bechtle.[4] DMSI renewed its motion for judgment on TRS's § 1 tying claim based on the jury's answers to interrogatories 9 and 10. Judge Bechtle reconsidered Judge Fawsett's earlier ruling and granted DMSI's motion for judgment on the § 1 tying claim.

TRS's § 2 claims were then the subject of a new jury trial before Judge Bechtle. This trial began on March 9, 1994, and lasted almost six weeks. A special verdict form was again

---

[4] Senior U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation in the Middle District of Florida.

**6**

submitted to the jury, to which the jury responded as follows:


I.   SHERMAN ACT - SECTION 2 MONOPOLIZATION CLAIM

1.  What do you find to be the relevant market in this case?  (check one)

__X__  The servicing of Dornier brand lithotripters (including the sale of parts).

_____  The servicing of all brands of lithotripters (including the sale of parts).

_____  The sale of lithotripter systems, including the machine as well as its servicing (including the sale of parts).

(Answer Question No. 2)


2.  Has TRS proven that DMSI possessed monopoly power in the relevant market?

Yes _X_   No ___

(If your answer is "yes," go to Question No. 3.  If your answer is "no," go to Question No. 5)


3.  Has TRS proven that DMSI willfully maintained that monopoly power by anticompetitive means or for anticompetitive purposes?

Yes ___   No _X_

(If your answer is "yes," go to Question No. 4.  If your answer is "no," go to Question No. 5)


4.  Has DMSI proven a legitimate business justification for its acts?

Yes ___   No ___

(Answer Question No. 5)


**7**

II.   SHERMAN ACT - SECTION 2 ATTEMPT TO MONOPOLIZE
      CLAIM

      5.   Has TRS proven that DMSI had a specific
      intent to achieve a monopoly in the relevant
      market?

            Yes ___    No _X_

      (If your answer is "yes," go to Question No.
      6.  If your answer is "no," go to Question
      No. 9)


      6.   Has TRS proven that DMSI engaged in
      predatory or anticompetitive conduct in
      furtherance of this intent?

            Yes ___    No ___

      (If your answer is "yes," go to Question No.
      7.  If your answer is "no," go to Question
      No. 9)


      7.   Has TRS proven that there was a dangerous
      probability that DSMI would succeed in
      achieving this monopoly?

            Yes ___    No ___

      (If your answer is "yes," go to Question No.
      8.  If your answer is "no," go to Question
      No. 9)


      8.   Has DMSI proven a legitimate business
      justification for its acts?

            Yes ___    No ___

      (Go to "Instructions for Question No. 9")


III.      INJURY

      Instructions for Question No. 9

      (If you answered "yes" to Question Nos. 2 and
      3, and answered "no" to Question No. 4,
      answer Question No. 9.  If you answered "yes"

**8**

to Question Nos. 5, 6 and 7, and answered
"no" to Question No. 8, answer Question No.
9.  Otherwise, do not answer Question No. 9.)

9.  Has TRS proven that it sustained injury
to its business which was directly and
proximately caused by DMSI's violation of
Section 2 of the Sherman Act?

Yes ___    No ___

Based on the jury's special verdict, Judge Bechtle entered judgment for DMSI on TRS's § 2 claims.  TRS moved for judgment as a matter of law on its § 2 claims and on DMSI's asserted business justification defenses.  In the alternative, TRS moved for a new trial on the grounds that the jury's verdict was internally inconsistent and contrary to the great weight of the evidence, and also on the ground that the district court improperly excluded relevant evidence.  Judge Bechtle denied TRS's motion, and thereafter entered an order awarding DMSI $184,778.84 in costs.

III.  ISSUES ON APPEAL

On appeal, TRS argues that the district court erred by denying TRS's motion to amend its complaint to add a new tying claim.  TRS further asserts that the district court erroneously granted judgment for DMSI based on the juries' verdicts because the juries' answers to the special verdict interrogatories were inconsistent.  In addition, TRS argues that the second jury's verdict was contrary to the great weight of the evidence and that TRS is entitled to judgment as a matter of law on DMSI's business

**9**

justification defenses to the § 2 claims.  Finally, TRS attacks the district court's award of costs to DMSI.[5]

## IV.  ANALYSIS

### A.  Proposed Amendment to Complaint

TRS filed its complaint against DMSI on October 11, 1991. DMSI answered on February 14, 1992.  Discovery in this case ended on January 4, 1993.  On January 5, 1993, TRS filed under seal a motion seeking to amend its complaint to add an additional § 1 tying claim alleging that Dornier lithotripter spare parts are the tying product and Dornier lithotripter servicing is the tied product.[6]  In an April 19, 1993, order, Judge Fawsett denied this

---

[5] TRS makes several additional arguments which warrant little discussion.  TRS argues that the district court erred by not imposing sanctions on DMSI for allegedly altering service meeting minutes produced during discovery, and by not conducting an evidentiary hearing on this issue.  After carefully reviewing the record and the arguments made to the district court in this regard, we cannot conclude that the district court abused its broad discretion.

We also cannot conclude that the district court abused its discretion by not ordering a new trial for TRS on the § 1 tying claim based on DMSI's delay in producing or withholding of documents in discovery.  Additionally, we are not persuaded that the district court erred by refusing to allow TRS to conduct certain depositions, and we therefore reject TRS's argument in this regard.

TRS further asserts that the district court made several erroneous evidentiary rulings which warrant a new trial on TRS's claims.  We review the district court's evidentiary rulings for an abuse of discretion, and reverse those rulings only when the party asserting error has shown prejudice to a substantial right.  Judd v. Rodman, 105 F.3d 1339, 1341 (11th Cir. 1997).  We find no abuse of discretion and therefore decline to disturb the district court's evidentiary rulings.

[6] TRS also unsuccessfully moved to amend its complaint to name DMSI's parent companies as defendants.  TRS's counsel informed this court at oral argument that TRS filed suit in the Northern District of Georgia against DMSI's parent companies after briefing had been completed in this appeal.  In light of this development, TRS acknowledged that its argument that the district court erred by refusing to add the parent companies to the instant lawsuit is now moot.  We

motion, indicating that TRS had delayed unduly in presenting the motion.[7]  Judge Fawsett explained that TRS had argued to her that DMSI had been on notice for several months that TRS intended to add the new tying claim.  However, Judge Fawsett reasoned that if DMSI had had such notice for months, then TRS must also have known for several months that the new tying claim existed, yet failed to make a motion to amend earlier.  Judge Fawsett explained that if the motion to amend were granted, the trial, which at that time was scheduled for June 1993, would almost certainly be delayed.

After this case had been transferred to Judge Bechtle, TRS filed a renewed motion to amend its complaint.  Judge Bechtle also denied this motion.

Rule 15(a) of the Federal Rules of Civil Procedure provides that "leave [to amend a party's pleading] shall be freely given when justice so requires."  In defining the scope of Rule 15(a), the Supreme Court has explained that

> [i]n the absence of any apparent or declared reason--
> such as undue delay, bad faith or dilatory motive on
> the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue
> prejudice to the opposing party by virtue of allowance
> of the amendment, futility of amendment, etc.--the

---

therefore need not address this issue.

[7] Judge Fawsett also stated that TRS had improperly filed the motion under seal, which caused delay in the district court's consideration of the motion. Excessive filings under seal apparently were a problem in this case and were burdensome for the district court.  In a separate order entered before Judge Fawsett's order denying TRS's motions to amend, but after TRS had filed its motions to amend, Judge Fawsett reprimanded the parties for improperly filing an excessive number of documents under seal, and ordered that numerous documents be unsealed.

leave sought should, as the rules require, be "freely
given."

Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962).

See also Jameson v. Arrow Co., 75 F.3d 1528, 1534-35 (11th Cir.

1996); Hargett v. Valley Fed. Sav. Bank, 60 F.3d 754, 761 (11th

Cir. 1995).  We review a district court's denial of a motion to

amend for an abuse of discretion.  Foman, 371 U.S. at 182, 83 S.

Ct. at 230; Jameson, 75 F.3d at 1534.

In its brief to this court, TRS argued that DMSI was on
notice by September 1992 that TRS intended to propose the new
tying claim amendment.  However, as Judge Fawsett observed, if
DMSI was on notice of the possibility of this claim in September
1992, so too was TRS.  TRS nonetheless inexplicably waited until
January 5, 1993, after discovery was completed, to make its
motion to add a new substantive claim.[8]  This proposed new claim
would have increased the complexity of an already complex
lawsuit, and probably would have required that discovery be
reopened.  Although ordinarily leave to amend should be "freely
given," dual concerns that TRS delayed unduly and that the
proposed amendment would have unduly prejudiced DMSI lead us to
conclude that the district court did not abuse its discretion by
denying TRS's motion to amend.

---

[8] TRS implied in its initial appellate brief and at oral argument that it
delayed in making the motion to add the new tying claim because it was awaiting
the Supreme Court's decision in Eastman Kodak Co. v. Image Technical Services,
Inc., 504 U.S. 451, 112 S. Ct. 2072 (1992).  This argument ignores the fact that
Eastman Kodak was decided on June 8, 1992, almost seven months before TRS's
motion to amend and almost seven months before discovery was completed in this
case.

**12**

B.  Judgment for DMSI on the §§ 1 and 2 claims

  1.  Consistency of the Juries' Verdicts

TRS asserts that the district court erred by granting judgment for DMSI based on the juries' special verdicts because the juries' answers to the special verdict interrogatories were inconsistent.  Both juries in this case were given a special verdict form pursuant to Rule 49(a) of the Federal Rules of Civil Procedure.  See generally 9A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure §§ 2505-2510 (2d ed. 1994) (discussing special verdicts).  In evaluating a claim that a jury's answers to a Rule 49(a) special verdict are inconsistent,

> the Seventh Amendment demands that, if there is a view of the case which makes the jury's answers consistent, this Court must adopt that view.  It does not matter whether [the appellant] can suggest equally plausible reasons for the verdict that would require reversal. The test to be applied in reconciling apparent conflicts between the jury's answers is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted . . . .

Aquachem Co., Inc. v. Olin Corp., 699 F.2d 516, 521 (11th Cir. 1983) (citations and internal quotations omitted).  See also Hattaway v. McMillian, 903 F.2d 1440, 1449 (11th Cir. 1990); Burger King Corp. v. Mason, 710 F.2d 1480, 1489 (11th Cir. 1983), cert. denied, 465 U.S. 1102, 104 S. Ct. 1599 (1984).  "[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them:  'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'"

**13**

Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119, 83 S. Ct. 659, 666 (1963) (quoting Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S. Ct. 780, 786 (1962)).

a)  The First Jury's Verdict

In order to prove a § 1 tying arrangement that is per se illegal, a plaintiff must establish at least the following basic elements:

> 1) that there are two separate products, a "tying" product and a "tied" product; 2) that those products are in fact "tied" together--that is, the buyer was forced to buy the tied product to get the tying product; 3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and 4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product.

Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1414 (11th Cir. 1987).  See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462, 112 S. Ct. 2072, 2079-80 (1992); Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1574 (11th Cir. 1991), cert. denied, 506 U.S. 903, 113 S. Ct. 295 (1992).

In evaluating TRS's § 1 tying claim, the first jury answered "No Decision" to interrogatory 8 regarding whether there were separate markets for Dornier lithotripters, the tying product, and service for Dornier lithotripters, the tied product.  The jury answered "no" to interrogatory 9 regarding whether DMSI possessed sufficient economic power in the lithotripter market to

**14**

force buyers of Dornier lithotripters to purchase service for the lithotripters, and "no" to interrogatory 10 regarding whether DMSI forced the buyers to purchase the tied product. TRS argues that the jury's answers to interrogatories 9 and 10 are inconsistent with the jury's inability to answer interrogatory 8. TRS contends that a jury could not answer interrogatories 9 and 10 without first deciding what the relevant market is for this case because definition of the relevant market is necessary in order to assess whether DMSI possessed sufficient power in that market to engage in unlawful tying.

Judge Fawsett agreed with TRS's argument and denied DMSI's motion for judgment on the § 1 tying claim. However, after this case was transferred to Judge Bechtle following the first jury trial, Judge Bechtle reconsidered Judge Fawsett's ruling and granted DMSI's motion for judgment on the § 1 tying claim.[9] We agree with Judge Bechtle that the first jury's answers to interrogatories 9 and 10 are not fatally inconsistent with the jury's failure to answer interrogatory 8 and require judgment for DMSI on the § 1 tying claim.

Interrogatory 9 asked the jury whether TRS had proven that

---

[9] Judge Bechtle was not bound by Judge Fawsett's earlier ruling. In general, when a case is transferred from one district judge to another, the parties should not treat the transfer as an opportunity to relitigate all of the first judge's rulings. United States v. Williams, 728 F.2d 1402, 1406 (11th Cir. 1984). However, the second district judge may reconsider the first judge's rulings when final judgment has not yet been entered. See id.; Robinson v. Parrish, 720 F.2d 1548, 1550 (11th Cir. 1983); Gregg v. U.S. Indus., Inc., 715 F.2d 1522, 1530, clarified on reh'g, 721 F.2d 345 (11th Cir. 1983), cert. denied, 466 U.S. 960, 104 S. Ct. 2173 (1984).

**15**

DMSI had "sufficient economic power <u>in the lithotripter market</u> to coerce the buyer to purchase service for Dornier lithotripters, the tied product." (emphasis added). This phrasing in effect asked the jury to assume <u>arguendo</u> that there are separate markets for lithotripters and lithotripter servicing, and then to evaluate whether or not DMSI possessed sufficient economic power in the lithotripter market to coerce buyers to purchase Dornier lithotripter servicing. Thus, a reasonable explanation for the jury's answer to interrogatory 9 is that although the jury was unable to agree as to whether or not there were separate markets for Dornier lithotripters and Dornier lithotripter servicing, the jury assumed without deciding, for the purpose of answering interrogatory 9, that there were separate markets, and then concluded that even if this assumption were true, DMSI did not possess sufficient economic power in the lithotripter market.[10] Similarly, a reasonable explanation for the jury's answer to interrogatory 10, which asked the jury whether TRS had proven that DMSI forced buyers to purchase the tied product, is that the jury assumed without deciding that there are in fact separate markets for Dornier lithotripters and Dornier lithotripter servicing, but that even if this assumption were true, TRS failed

---

[10] TRS argues that the jury finding of insufficient economic power might have related to the larger market of lithotripter sales and the servicing thereof, and that such a finding said nothing about the crucial issue of market power in the smaller market for the tying product, lithotripter sales. However, TRS's argument is wholly without merit because interrogatory 9 is expressly addressed to the smaller lithotripter market. Thus, the jury found that TRS had failed to prove that "DMSI possessed sufficient economic power <u>in the lithotripter market</u> to coerce the buyer to purchase service for Dornier lithotripters, the tied product." (emphasis added).

**16**

to prove that DMSI forced buyers to purchase servicing.

As the above discussion indicates, there is a fair and reasonable reading of the jury's answers that makes them consistent; we therefore accept that view. See Gallick, 372 U.S. at 119, 83 S. Ct. at 666; Aquachem, 699 F.2d at 521. Because the jury concluded that DMSI did not possess the requisite economic power in the tying product market (interrogatory 9) and because the jury found that DMSI had not forced the buyer to purchase the tied product (interrogatory 10), we conclude that Judge Bechtle did not err by entering judgment for DMSI on the § 1 tying claim based on the partially completed special verdict form. The jury's unanimous findings that TRS failed to prove two elements that are essential to a successful tying claim compel the grant of judgment for DMSI on the § 1 tying claim, despite the jury's inability to answer the other tying claim interrogatories. Regardless of how the jury might have answered interrogatory 8, or for that matter, interrogatories 11 and 12, the jury's negative answers to interrogatories 9 and 10 conclusively preclude TRS from prevailing on its tying claim. See Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 190-91 (4th Cir. 1994) (affirming entry of judgment based on a partially completed special verdict form); Audette v. Isaksen Fishing Corp., 789 F.2d 956, 958 (1st Cir. 1986) (same); Skyway Aviation Corp. v. Minneapolis, Northfield & Southern Ry. Co., 326 F.2d 701, 704 (8th Cir. 1964) (same).

### b)  The Second Jury's Verdict

TRS also argues that the second jury's answers to the special verdict interrogatories regarding TRS's § 2 claims are inconsistent.  TRS brought two claims under § 2 of the Sherman Act:  a monopolization claim and an attempt to monopolize claim. A § 2 monopolization claim has two elements:

> "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

Eastman Kodak, 504 U.S. at 481, 112 S. Ct. at 2089 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704 (1966)).  See also Levine v. Central Florida Med. Affiliates, Inc., 72 F.3d 1538, 1555 (11th Cir.), cert. denied, 117 S. Ct. 75 (1996); T. Harris Young & Assocs. v. Marquette Elecs., 931 F.2d 816, 823 (11th Cir.), cert. denied, 502 U.S. 1013, 112 S. Ct. 658 (1991).

In order to prove an attempt to monopolize claim under § 2, a plaintiff must show that (1) the defendant has engaged in predatory or anticompetitive conduct, (2) the defendant engaged in such conduct with the specific intent to monopolize, and (3) there existed a dangerous probability that the defendant might have achieved monopoly power.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S. Ct. 884, 890-91 (1993); U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 993 (11th Cir. 1993).  Additionally, in evaluating a § 2 attempt to

**18**

monopolize claim, it is necessary to consider the relevant market and the defendant's power in that market. Spectrum Sports, 506 U.S. at 459, 113 S. Ct. at 892; U.S. Anchor Mfg., 7 F.3d at 994; T. Harris Young & Assocs., 931 F.2d at 823.

A defendant can escape § 2 liability if the defendant's actions can be explained by legitimate business justifications. See Eastman Kodak, 504 U.S. at 483 & n.32, 112 S. Ct. at 2091 & n.32; Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 627, 73 S. Ct. 872, 890 (1953).

In deciding TRS's § 2 claims, the second jury defined the product market narrowly, as TRS proposed, to include only the servicing of Dornier lithotripters (interrogatory 1). The jury found that DMSI possessed monopoly power in the Dornier lithotripter servicing market (interrogatory 2), but that DMSI did not willfully maintain that monopoly power by anticompetitive means or for anticompetitive purposes (interrogatory 3). The jury further found that DMSI did not have the specific intent to achieve a monopoly in the Dornier lithotripter servicing market (interrogatory 5).

A fair and reasonable reading of the jury's verdict is that the jury chose to credit some or all of DMSI's business justifications, and consequently concluded that DMSI did not willfully maintain its monopoly power and did not have the specific intent to achieve a monopoly. Challenging this conclusion, TRS argues that DMSI's only attempt to explain its behavior was to state that it was responding to competition from

**19**

other original equipment manufacturers.  TRS asserts that this explanation was irrelevant because the jury found that the relevant market was the servicing of Dornier lithotripters, and other original equipment manufacturers did not service Dornier lithotripters.  We reject TRS's argument because its premise is faulty.[11]  DMSI's attempts to explain its behavior were not limited to the one explanation identified and challenged by TRS.  In addition to stating that it was responding to competition from other original equipment manufacturers, DMSI also asserted, <u>inter alia</u>, the following business justifications, which are not rendered irrelevant by the jury's definition of the relevant market:  (1) concerns about its product liability exposure, (2) a desire to guarantee quality service and parts availability to its customers, (3) the need to protect its trade secrets and proprietary information, (4) the decision not to assume the added costs of becoming a parts wholesaler, (5) the past litigiousness of, and prior disputes with, TRS, and (6) a decision not to help its rival, TRS.  We conclude that the jury could have chosen to credit some or all of these asserted business justifications.[12]

---

[11] We also doubt that the identified explanation is rendered irrelevant because of the jury's definition of the relevant market.  However, we need not address that issue in light of the ample other business justifications discussed below.

[12] TRS has not challenged the legal viability of these business justifications; we therefore need not consider any such argument.  We do note, however, that at least two of DMSI's asserted business justifications were expressly recognized in <u>Eastman Kodak</u>.  <u>See</u> 504 U.S. at 483-85, 112 S. Ct. at 2091-92 (explaining that triable issues of fact existed regarding Kodak's asserted business justification defenses of providing quality service and controlling inventory costs).

TRS argues that the second jury's answers to the interrogatories are fundamentally inconsistent with the conclusion that the jury chose to credit some or all of DMSI's business justifications. To support this argument, TRS points to the jury's failure to answer interrogatories 4 and 8, which asked whether DMSI had proven a legitimate business justification. However, the jury's failure to answer interrogatories 4 and 8 is amply explained by an examination of the jury's instructions. The special verdict form explicitly instructed the jurors that if they answered interrogatory 3 "no," which they did, they should skip interrogatory 4 and go to interrogatory 5. Similarly, the special verdict form also instructed the jurors that if they answered interrogatory 5 "no," which they did, they should skip interrogatories 6 - 8 and go to interrogatory 9. Judge Bechtle so instructed the jury when giving the jury instructions; and when the special verdict was read in open court, the jury foreperson indicated that the jury so understood the instructions. In light of these instructions, it is not inconsistent for the jury both to have credited some or all of DMSI's business justifications and not to have answered interrogatories 4 and 8. Cf. Gallick, 372 U.S. at 118-22, 83 S. Ct. at 666-67 (focusing on the trial court's instructions to the

---

TRS does argue, as a factual matter, that DMSI's asserted business justifications were pretextual and that TRS was therefore entitled to judgment as a matter of law on these business justification defenses. Having reviewed the record, we conclude that DMSI's business justification defenses presented factual issues that were properly submitted to the jury for resolution. We thus reject TRS's argument in this regard.

**21**

jury in resolving a challenge to the consistency of a special verdict). Because there is a reading of the jury's verdict which makes the verdict consistent, we must adopt that view. Id. at 119, 83 S. Ct. at 666; Aquachem, 699 F.2d at 521. We thus conclude that the second jury's verdict was not fatally inconsistent.

Because the jury found that DMSI had not willfully maintained its monopoly power by anticompetitive means or for anticompetitive purposes, TRS failed to prove an essential element of its § 2 monopoly claim. Similarly, because the jury found that DMSI did not have the specific intent to achieve a monopoly in the relevant market, TRS failed to prove an essential element of its § 2 attempt to monopolize claim. These dispositive jury findings compel us to conclude that Judge Bechtle properly entered judgment for DMSI on the § 2 claims.


### 2. Sufficiency of the Evidence

TRS also argues that the second jury's verdict was against the great weight of the evidence and that a new trial is therefore warranted on the § 2 claims. After the second jury trial, TRS moved for a new trial on this ground, and Judge Bechtle denied TRS's motion. We review a district court's disposition of a motion for a new trial for an abuse of discretion. Insurance Co. of North America v. Valente, 933 F.2d 921, 923 (11th Cir. 1991); Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 643 (11th Cir. 1990). This deferential standard of

review is especially appropriate where, as here, the district court denied the motion and left undisturbed the jury's determinations.  See Valente, 933 F.2d at 925.  Our review of the record in this case reveals that there was ample evidence to support the second jury's determinations, and that Judge Bechtle did not abuse his discretion by denying TRS's motion for a new trial.

    C.  Costs

    TRS contests the district court's award of $184,778.84 in costs to DMSI under 28 U.S.C. §§ 1821 and 1920.  This court will not disturb a costs award in the absence of a clear abuse of discretion.  Cochran v. E.I. duPont de Nemours, 933 F.2d 1533, 1540 (11th Cir. 1991), cert. denied, 502 U.S. 1035, 112 S. Ct. 881 (1992).  We conclude that the district court did not abuse its discretion in awarding costs to DMSI, with the exception of the award for videographer expenses.  A portion of the $5,950.48 award to DMSI for videographer expenses appears to include reimbursement for the cost of renting video equipment to play videotaped depositions at the two trials.  Such video equipment rental expenses may not be awarded as costs.   Morrison v. Reichhold Chems., Inc., 97 F.3d 460, 465-66 (11th Cir. 1996).[13] We therefore vacate the award of $5,950.48 for videographer expenses, and we remand only that portion of the costs award to

_____

    [13] We note that Morrison was decided after the costs award in this case was calculated.

**23**

the district court for a recalculation of such costs in that category as are permissible.  In all other respects, the costs award is affirmed.

## V.   CONCLUSION

We affirm the district court's judgment for appellee DMSI on appellant TRS's §§ 1 and 2 claims, and we affirm in part and vacate and remand in part the district court's order awarding DMSI costs.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.