[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 25, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-13345

_____

D. C. Docket No. 97-00144-CV-HL-7

KAY SESSOMS HINSON,

Plaintiff-Appellant,

versus

CLINCH COUNTY, GEORGIA BOARD
OF EDUCATION; SUPERINTENDENT
OF SCHOOLS FOR CLINCH COUNTY,
GEORGIA; et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(October 25, 2000)**

Before EDMONDSON, DUBINA and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Dr. Kay Sessoms Hinson, a high school principal in Clinch County, Georgia

who was transferred to a teaching position, brought this employment

discrimination action against the Clinch County Board of Education, its superintendent, and various board members under Title VII and 42 U.S.C. § 1983. On appeal, Hinson contends that the district court erred in granting summary judgment to the defendants after concluding that she did not suffer a "demotion" for which the defendants might be liable. We affirm in part and reverse in part.

BACKGROUND

Dr. Hinson was the principal of Clinch County High School for four years. She was the first female high school principal hired in Clinch County, Georgia since at least 1950. Dr. Hinson's husband, David Hinson, worked as the media and technology coordinator for the Clinch County school system.

Dr. Hinson's troubles with the Clinch County Board of Education (the "Board") seem to have been triggered by a disagreement with defendants Henry Moylan, Allen Kennedy and Jimmy McMillan over where to locate a new middle school. Dr. Hinson also had a history of tense conversations with Kennedy regarding Kennedy's son, a student at the high school. Another source of friction between Dr. Hinson and Kennedy was his habit of referring to Dr. Hinson by a childhood nickname, "Kay Baby," even after Dr. Hinson had asked Kennedy to call her by her proper name.

After Dr. Hinson recommended locating the middle school adjacent to her high school, and after she and Kennedy had an unpleasant discussion about Kennedy's son, Kennedy and Moylan moved into positions of power over her. Moylan became superintendent of schools; Kennedy successfully ran for the Board. After Kennedy won his election and joined McMillan on the Board, he symbolically "buried" Dr. Hinson in front of the local courthouse to celebrate his victory.

Shortly thereafter, Dr. Hinson began hearing rumors that Moylan and Kennedy were "plotting" to remove her as principal. Moylan reassured Dr. Hinson that she was doing a good job and should not worry about being terminated.

Despite these assurances, the Board voted to remove Dr. Hinson as principal and move her to an administrative position.[1] Moylan told Dr. Hinson that she was being transferred to a county-wide position because he needed Dr. Hinson's expertise in writing grant applications and improving the county's system-wide testing. Although Moylan described the move as a promotion, Dr. Hinson suspected it was merely a make-work position designed to facilitate her removal as principal. She was doubtful because she was told she would receive a significant

_____

[1]The Board's vote was three in favor of removing Dr. Hinson as principal and two opposed, with defendants McMillan, Kennedy and Handley voting for removal. Of those three, Kennedy was not a member of the Board when it had voted to hire Dr. Hinson.

3

pay cut, she had already been performing the functions of the new job while she was the principal, and the new position did not exist before the vote.[2]

Dr. Hinson told Moylan she did not want an administrative position and preferred a job where she would have contact with students. The Board then voted to transfer Dr. Hinson to a full-time teaching position at Homerville Elementary and Middle School. After the Georgia Association of Educators requested a hearing on Dr. Hinson's behalf to contest her transfer, the Board voted to maintain Dr. Hinson's old salary in her new position. Thereafter, the Board declined to grant a hearing, claiming that Dr. Hinson had not suffered a demotion that entitled her to a hearing under Georgia law.

Dr. Hinson's salary was contingent on her working 210 days a year. This is the same number of days she would have worked as a principal, but twenty more days a year than teachers normally worked. Dr. Hinson was not assigned any tasks to perform during these additional twenty work days, but was required to show up and sit at her desk with nothing to do.

To replace Dr. Hinson as principal, the Board chose the man who had served under her as vice-principal, Donald Tison. Tison had less experience as a principal

---

[2]Indeed, the new position was not filled as of the date of this appeal.

than Dr. Hinson and held fewer advanced degrees.[3] Dr. Hinson filed a charge of discrimination with the EEOC, claiming that the Board had discriminated against her based on her gender and her age.[4]

Responding to Dr. Hinson's charge, the Board stated it transferred Dr. Hinson not because of her gender, but "because of basic disagreements with her approach to operating and administering the Clinch County High School. The Board was also somewhat disappointed in her capabilities as a principal."

Dr. Hinson received a right-to-sue letter. She timely sued the Board; Moylan, the superintendent of schools (both as an agent of the County and as an individual); and the individual Board members who had voted to transfer her. Her complaint alleged, among other things, that the Board and the individual defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and deprived her of due process under 42 U.S.C. § 1983.

Within two weeks after Dr. Hinson filed her complaint, the Board convened a special Sunday meeting. The only Board members present were those who had

---

[3]Although both Dr. Hinson and Tison had bachelor degrees, master's degrees, and education specialist degrees, only Dr. Hinson had a doctorate.

[4]Dr. Hinson later dropped her age discrimination claim.

voted to remove Dr. Hinson as principal.[5] The subject of that meeting was some videotapes that had come to the Board's attention. The videotapes, some of which were discovered in the office of Dr. Hinson's husband at the high school, had been taken by a camera installed in the high school's visiting girls' locker room. A theft had occurred in the locker room during one of the games, and the reason for the videotaping was to monitor the locker room for unauthorized entry. The camera was installed with the knowledge of both Dr. Hinson and the vice-principal who subsequently replaced her, Tison.

Dr. Hinson's husband was charged with the crime of eavesdropping and suspended from his employment with the school system. The Board did not punish Tison for his involvement. Nor did it punish Lonnie Webb, the resource officer who actually installed the camera. Ultimately, it was determined that there was nothing unlawful about installing the camera or maintaining the tapes. After a hearing, David Hinson lost his job.

Meanwhile, Dr. Hinson's lawsuit was working its way through the district court. The parties took discovery and engaged in discovery disputes. After some preliminary procedural skirmishes, the defendants moved for summary judgment.

---

[5]Moylan testified that he could not contact the two Board members who had supported Dr. Hinson to notify them of the meeting.

After the parties had briefed the summary judgment issues, Dr. Hinson moved to compel discovery. She sought to compel deposition answers, pay records, computer information, and minutes of administrative meetings. The district court denied Dr. Hinson's motion, stating she had been dilatory in seeking to compel discovery.

Shortly after the Hinsons received the adverse decision from the hearing tribunal about Mr. Hinson's job, Dr. Hinson moved to amend her complaint. She sought to add her husband as a party and to add claims alleging that the Board had acted against both Hinsons in retaliation for Dr. Hinson's lawsuit. Noting that Dr. Hinson waited to amend her complaint until discovery was closed and dispositive motions had been filed, the court denied Dr. Hinson's motion based on undue delay.

After disposing of these preliminary matters, the district court granted summary judgment against Dr. Hinson. First, the court noted that this court's precedent barred Dr. Hinson from bringing a Title VII action against the individual defendants.[6] Second, the court granted summary judgment for the defendants on Dr. Hinson's claim under 42 U.S.C. § 1983 alleging a violation of her due process

---

[6] *See, e.g., Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII . . . are inappropriate.").

rights. The court noted that Dr. Hinson's due process claim was based on her state law rights as an employee; therefore, she had no substantive due process claim.[7] Further, the court ruled that Dr. Hinson's procedural due process claim failed because the Georgia law giving her a property right in continued employment only provided a hearing if she suffered a "demotion," that is, a decrease in salary, prestige, and responsibility. Since Dr. Hinson did not suffer a loss of salary, the court concluded that Georgia law did not entitle her to a hearing before being transferred. Therefore, the court granted judgment for the defendants on Dr. Hinson's § 1983 procedural due process claim.

Last, the district court ruled for the defendants on Dr. Hinson's Title VII claim. The court ruled that Dr. Hinson suffered no adverse employment action. The court also noted that even if Dr. Hinson had received a demotion, she had not offered any "significantly probative evidence which supports her contention that the real reason for Defendants' decision was her gender. In the absence of such a showing, the County Defendants are entitled to summary judgment on Plaintiff's Title VII claim." Having granted summary judgment on Dr. Hinson's federal

---

[7] *See McKinney v. Pate,* 20 F.3d 1550, 1559 (11th Cir. 1994) (ruling that "state employment decisions are not covered by . . . substantive due process jurisprudence").

8

claims, the court exercised its discretion under 28 U.S.C. § 1367(c) to dismiss Dr. Hinson's state law claims without prejudice.

DISCUSSION

We review the denials of the plaintiff's motions to compel discovery and amend her complaint for abuse of discretion. *See R.M.R. by P.A.L. v. Muscogee County Sch. Dist.,* 165 F.3d 812, 816 (11th Cir. 1999) (motion to compel); *Technical Resources Servs. v. Dornier Medical Sys.*, 134 F.3d 1458, 1464 (11th Cir. 1998) (motion for leave to amend complaint). Given that Dr. Hinson had waited so long to file her motion, the district court acted within its discretion in denying Dr. Hinson leave to add her husband as a new party and to add new claims on both their behalf. Nor did the district court abuse its discretion in denying Dr. Hinson's motion to compel production due to her delay in bringing the motion. We now turn to the district judge's grant of summary judgment for the defendants.

We review the grant of summary judgment *de novo*. *See Wise Enterprises, Inc. v. Unified Govt't of Athens-Clarke County,* 217 F.3d 1360, 1362 (11th Cir. 2000). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

9

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, ___ U.S. ___, 120 S.Ct. 2097, 2110 (2000) (discussing standard for granting judgment as a matter of law under Fed. R. Civ. P. 50, which is the "same" as the standard for granting summary judgment under Rule 56). "[T]he court should give credence to the 'evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citations omitted). In other words, we must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 2102.

## I. Title VII

The district court correctly ruled that the individual defendants were not proper defendants to Dr. Hinson's Title VII claims. "The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). The only proper individual defendants in a Title VII action would be supervisory employees in their capacity as agents of the employer. *See*

10

*id.* The district court correctly granted summary judgment in favor of the individual defendants.

The court erred, however, in granting summary judgment for the County defendants. As explained below, Dr. Hinson established a prima facie case under Title VII. Further, Dr. Hinson presented evidence that could lead a reasonable jury to conclude that the Board's stated reasons for transferring Dr. Hinson were pretext for unlawful discrimination.

Direct Evidence

Plaintiffs bear the burden of proving that the employer discriminated against them unlawfully. *See Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1082-83 (11th Cir. 1996). They may do so through either direct or circumstantial evidence. Direct evidence is that which shows an employer's discriminatory intent "without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). As direct evidence, Dr. Hinson calls our attention to four items: First, Dr. Hinson claims to be the first female principal "in memory" in Clinch County. Second, a Board member, Kennedy, had a longstanding habit of referring to Dr. Hinson as "Kay Baby." Third, no male principals had ever been removed involuntarily; and fourth, her evaluation was no different than that of her replacement, Tison.

11

These items do not constitute direct evidence of discrimination. First, Dr. Hinson has not shown that it is statistically significant that she was the only woman to become a school principal in Clinch County or that no males were involuntarily removed. Without knowing how many other women applied and what their qualifications were, or without knowing the track record of the unremoved males, this statistical data is not direct evidence of discrimination. *See Evans v. McClain, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997). In *Evans*, the employer had hired only three black supervisors in its history (out of 650 employees in eight locations). The plaintiff argued that this hiring pattern constituted direct evidence of discrimination. *See id.* This court rejected the argument, noting that the evidence was irrelevant without a showing of "'how many blacks applied and were rejected and evidence of the success rate of equally qualified white applicants.'" *See id.* (quoting *Howard v. B. P. Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir. 1994)). Likewise, without evidence that the male principals' behavior was statistically similar to Dr. Hinson's, their benign employment history is not directly probative of discrimination. Similarly, because Dr. Hinson has not shown that any qualified women applied for the job of principal

12

and were rejected, the mere fact that she was the only female principal hired is not direct evidence of discrimination.[8]

Second, Kennedy's use of "Kay Baby" does not, in and of itself, display a gender-based animus that directly motivated Kennedy to subject Dr. Hinson to any adverse employment action. For one thing, it is unrefuted that "Kay Baby" was a childhood nickname for Dr. Hinson that Kennedy learned from his father. In addition, Dr. Hinson admits that Kennedy did not refer to her as "Kay Baby" once he became a Board member with decision-making authority. *Cf. id.* at 962 (ruling "stray" comments were, at best, circumstantial evidence of discriminatory motive, particularly when made by non-decisionmaker) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Conner J., concurring)).

Last, as Dr. Hinson herself admits, an inference is necessary for a jury to conclude that, given that Tison's evaluation was the same as hers, the only reason the Board would replace her with Tison was gender discrimination. Direct evidence is not inferential; it is "'evidence which if believed, proves existence of fact in issue without inference or presumption'") *Burrell v. Board of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (citation omitted). Since Dr. Hinson did not present direct evidence sufficient to create an issue of

_____

[8]We note that, for example, no women applied to replace Dr. Hinson.

material fact, we evaluate her case under the "circumstantial evidence" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Circumstantial Evidence

Dr. Hinson bears the burden of showing sufficient evidence to allow a reasonable jury to determine that she satisfied the elements of her prima facie case of gender discrimination. *See id.* Once she has done so, the burden shifts to the Board "to articulate some legitimate, nondiscriminatory reason" for transferring her. *Id.* At that point, Dr. Hinson must "be afforded a fair opportunity to show" that the Board's reasons were pretextual. *Id.* at 804.

Prima Facie Case

To establish a prima facie case, Dr. Hinson has to show four things: (1) that she was a member of a protected class, (2) that she was qualified for the job, (3) that she suffered an adverse employment action, and (4) that she was replaced by someone outside the protected class. *See Reeves*, 120 S.Ct. at 2106; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998); *Evans*, 131 F.3d at 964; *Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155 (5th Cir. 1979).

14

The parties do not dispute that Dr. Hinson was qualified (she served as principal for four years)[9] and was a woman replaced by a man. The defendants, however, claim that Dr. Hinson suffered no adverse employment action. The district court agreed, finding that Dr. Hinson's transfer was not a demotion. The court found it significant that after her transfer Dr. Hinson continued to receive the same salary as when she was a principal. Additionally, some Board members testified that they considered Dr. Hinson's new position to have more prestige than her old position.

Determining whether an employment action is adverse for purposes of Title VII is a matter of federal, not state, law. As we will discuss shortly, a transfer can constitute an adverse employment action for Title VII purposes, even if under state law the transfer is not considered a demotion. In a Title VII case, a transfer to a different position can be "adverse" if it involves a reduction in pay, prestige or responsibility. *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998). We use an objective test, asking whether "a reasonable person in [the plaintiff's] position would view the employment action in question as adverse." *Id.* at 1449.

---

[9]*See Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983) ("where a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of prima facie case can be inferred").

15

We first compare the administrative position to the principal position to determine whether the proposed transfer -- if the transfer had occurred -- would have been an adverse employment action.[10] Moylan told Dr. Hinson that the administrative position involved a pay cut of approximately $4,000 a year. Transferring an employee to a job with lower pay is an adverse employment action. *See id.* at 1452 (reduction in pay is adverse).

In addition, Dr. Hinson has created an issue of fact that the new position was less prestigious. Although transferring to a system-wide administrative position might be seen by some as a promotion, Dr. Hinson argues this is not so in Clinch County. She states that moving from being the principal of the only high school in the county to being one of several administrators could be seen as a loss of prestige.

Dr. Hinson's argument is bolstered by the make-work aspect of not only the original administrative position, but also the position that the Board ultimately

---

[10]When plaintiff objected to the transfer to an administrative post, the Board did not insist on it. A proposed uneffectuated transfer is not an adverse employment action. We address the proposed transfer to the administrative position in this case, not because it, in itself, was an adverse employment action, but because defendants stress that Dr. Hinson rejected this proposed transfer and elected, instead, to take the teaching position. Defendants argue that the proposed transfer would not have been an adverse employment action: they say it would have resulted in a more prestigious position and would have demanded more responsibility. Then, they contend that it was Dr. Hinson's choice to take the teaching position and, therefore, that the move to teaching could not be an adverse employment action on defendant's part because defendant did not wrongfully cause her to take this job of lesser status.

16

created for her. Before the Board voted to remove Dr. Hinson as principal, the tasks incumbent in the "new" administrative position had been performed by existing personnel, including herself.[11] Further, the Board has yet to fill the position, permitting a jury to infer that it was not really an important one. Because the administrative position entailed a significant loss of pay and because there is a genuine issue of fact as to whether the new job was less prestigious, a reasonable factfinder could consider the administrative job a demotion, and it is error to conclude otherwise.

Clearly, a teacher's job offers less responsibility and prestige than a principal's job. Teachers work under the direction and supervision of their principals and are subject to their discipline. Although Dr. Hinson's pay remained the same in her new position, Dr. Hinson claims she would have received a higher salary had she remained as principal. In rebuttal, the defendants have submitted an affidavit from Moylan averring that, "If Dr. Hinson had remained principal of the Clinch County High School she would have continued to receive the exact pay she receives today, $69,325.50."

---

[11]For example, while Dr. Hinson was a principal, she wrote grants for the county school system.

17

Dr. Hinson notes that her replacement, Tison, received pay for 230 days (12 months), while she was only paid for 210 days (11 months). There could, however, be many reasons for the Board to place Tison on 12 months' pay, including his willingness to assume additional tasks. Dr. Hinson has not shown that if she had remained as principal, she would have warranted being paid for 230 days instead of the 210 days she worked when she was a principal. Therefore, she has not created a material issue of fact regarding whether she was deprived of the opportunity for additional compensation.

Even if Dr. Hinson's new position were considered quasi-administrative due to the extra month's pay, a factfinder could conclude that the additional job requirements were make-work tailored to prevent Dr. Hinson from contesting her removal. Quite telling is Dr. Hinson's testimony that the Board required her to show up for twenty extra days of work, but gave her no tasks to perform. A reasonable juror could infer that sitting at an empty desk for twenty work days (a work month) would not be considered a promotion. *See Evans,* 131 F.3d at 964 (citing *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994) ("employee who was given fewer responsibilities and was made to perform more menial tasks suffered adverse employment action").

18

In short, a reasonable factfinder could conclude that Dr. Hinson suffered a loss of prestige and responsibility by being transferred to either the administrative or the teaching position. In addition, Dr. Hinson would have suffered a pay cut by moving to the administrative position. The district court erred in ruling that Dr. Hinson did not present a prima facie case because she did not suffer an adverse employment action.

Legitimate Nondiscriminatory Reason/Pretext

Because Dr. Hinson met her burden of showing sufficient evidence to present a prima facie case, a presumption arose that the Board discriminated against her. *See St. Mary's Honor Ctr.,* 509 U.S. at 506-07 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The Board rebuts that presumption by asserting several nondiscriminatory reasons for transferring Dr. Hinson: (1) The Board thought that Dr. Hinson's abilities could be better used at the system-wide level; (2) Board members were unhappy with Dr. Hinson's performance as principal, including the following concerns: maintenance at the school was bad; there were fights at the school; some students were upset because Dr. Hinson did not allow them to leave a seat open at graduation to commemorate a student who had committed suicide; Dr. Hinson dampened "school spirit" by making announcements that quelled excitement at the end of a pep rally; she did

19

not reprimand a teacher when Moylan asked her to; and other such instances. These concerns, although perhaps not overwhelming, sufficiently met the Board's burden of producing some legitimate, nondiscriminatory reasons for transferring Dr. Hinson. *See Burdine*, 450 U.S. 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.") (citation omitted).

Once the Board met its burden, "'the presumption raised by the prima facie case is rebutted, . . . and drops from the case.'" *St. Mary's*, 509 U.S. 507 (quoting *Burdine*, 450 U.S. at 255 & n.10). At this point, Dr. Hinson must produce evidence sufficient to enable a factfinder to conclude that the Board's stated reasons "'were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 120 S.Ct. 2106 (quoting *Burdine*, 450 U.S. at 253). We agree with the district court that "Plaintiff has challenged each of Defendants' explanations for their decision to reassign her from the Principal position, and has explained in some detail why those reasons are a pretext for discrimination."

Dr. Hinson prepared a detailed chart showing the inconsistencies and weaknesses in every reason the Board propounded for being dissatisfied with her. She notes that when Moylan completed his last job evaluation of Dr. Hinson, he

evaluated her performance as excellent in every category except school cleanliness. While Dr. Hinson, as principal, bore the ultimate responsibility for the state of the school overall, the person who was primarily responsible for supervising cleanliness at the school was the vice-principal, Tison. A reasonable jury could conclude that if the Board were truly concerned about the school's maintenance problems, it would not have chosen to replace Dr. Hinson with the very person who had done a poor job keeping the school clean in the first place.

As for the defendants' other complaints, Dr. Hinson notes that the first time many of them were expressed was in response to her EEOC charge of discrimination. Moylan testified that whenever he "had a situation where I felt like we needed to discuss, I felt like me and her sat down and discussed things." His failure to raise an issue could therefore indicate that it was not serious enough to warrant discussion with Dr. Hinson.[12] *Cf. Hairston v. Gainesville Sun Publ'g Co.*,

---

[12]Dr. Hinson has cast doubt on these heretofore-unexpressed concerns. For example, (1) Moylan's wife had complained about Dr. Hinson asking Moylan why he had checked his son out of school during a day of racial stress; Dr. Hinson notes that Moylan did not discuss the issue with her, but Dr. Hinson was legitimately concerned that Moylan, then an assistant principal, would set a bad example by taking his child out of school and destabilizing a tense situation. (2) The defendants said they received complaints about the "I Can" drug program that Dr. Hinson implemented; Moylan not only did not raise these concerns with Dr. Hinson, he congratulated her on her presentation of the program to the Board. (3) Kennedy was upset with Dr. Hinson for punishing his son for fighting. After Dr. Hinson investigated the matter, she could not confirm that Kennedy's son was not the aggressor as Kennedy claimed, and she followed her zero-tolerance policy regarding fights. (4) Dr. Hinson did not allow the students to feature the "empty chair" at graduation based on a professional counselor's advice that it was not a good idea to present suicide as "heroic."

9 F.3d 913, 921 (11th Cir. 1993) (plaintiff showed pretext in ADEA retaliation case when he had received good performance evaluations historically, but "received numerous unfavorable performance evaluations" after filing administrative complaints).

Finally, the Board's statement that Dr. Hinson's talents could better be used as a system-wide administrator is belied by the make-work nature of the administrative position, the Board's willingness to re-route Dr. Hinson to a teaching job, and Dr. Hinson's training and experience, which were primarily related to hands-on teaching, not administration. Further, when the Board had the opportunity to use Dr. Hinson's administrative skills, it instead required her to sit at a desk with nothing to do.

As the district court noted, Dr. Hinson successfully challenged the believability of the defendants' stated reasons for transferring her. But the court erred in requiring Dr. Hinson to show not only pretext but also additional evidence that the Board discriminated against her based on her sex.

In *Reeves*, the Court wrote that in some Title VII cases "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 120 S.Ct. at 2108. *See generally Chapman v. AI Transport*, 11th Cir., 2000, ___ F.3d ___ (Nos. 97-8838, 97-9086, 97-9269,

October 2, 2000) (en banc). A Title VII plaintiff need not always "introduce additional, independent evidence of discrimination" to establish liability once a prima facie case of discrimination has been established and there is sufficient evidence to reject the employer's explanation. *Reeves*, 120 S. Ct. at 2109. In determining whether summary judgment or judgment as a matter of law is appropriate in any particular case, the court should take into consideration a number of factors. Those factors "include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered . . . ." *Id.* We have taken those factors into consideration in this case. After examining the record, we conclude that this is a case where "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. Thus, the district court erred in granting summary judgment for the defendants on Dr. Hinson's Title VII claim.

## II. Section 1983

Section § 1983 provides liability against persons who, acting under color of law, deprive "any" person of "any rights, privileges, or immunities secured by the

Constitution and laws . . . ." 42 U.S.C. § 1983. Dr. Hinson claims that the defendants deprived her of both substantive and procedural due process.

The district court ruled that Dr. Hinson had no viable § 1983 substantive due process claim. As the court noted, in cases based merely on an arbitrary deprivation of state-law employment rights, "only procedural due process claims are available to pretextually terminated employees." *McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc).

On appeal, Dr. Hinson argues that her § 1983 substantive due process claim is based not on the arbitrary loss of state-law employment rights, but rather on her right to be free from governmental discrimination due to her gender. In essence, she is arguing an equal protection claim,[13] although she neither alleged an equal protection claim in her complaint nor briefed the issue as such before the district court. Given the state of the pleadings below, which the plaintiff admits were "inartful," the district court rightly granted summary judgment for the defendants on Dr. Hinson's substantive due process claim.

Nor did the district court err in ruling that Dr. Hinson had no procedural due process injury. As a matter of federal constitutional law, we must determine

------

[13]*See Johnson v. City of Fort Lauderdale*, 148 F.3d 1228, 1230 (11th Cir. 1998) (ruling that public-sector employees can bring parallel Title VII and § 1983 actions to remedy "unconstitutional public sector employment discrimination").

whether Dr. Hinson had a ("legitimate claim of entitlement") that must be protected under the due process clause. *See Hatcher v. Board of Pb. Educ.,* 809 F.2d 1546, 1551 (11th Cir. 1987) (citation omitted). The viability of Dr. Hinson's procedural due process claim depends on whether she had a "property right in continued employment." *Cleveland Bd. of Educ. v Loudermill*, 470 U.S. 532, 538 (1985). The property right is that created by state law. *See Board of Regents v. Roth*, 408 U.S. 564, 577-78 (1972) (noting that tenure rights are "created and defined" by the terms of employment, state statutes, and school rules or policies).

Under the Georgia statutes in effect during Dr. Hinson's term as a principal, the Board could decline to renew her contract or demote her only for "good and sufficient cause" including incompetence, insubordination, willful neglect of duties, or immorality. *See O.C.G.A.* §§ 20-2-942, 20-2-940(a).[14] Georgia law mandates that a job transfer is not a "demotion" unless "there has been an adverse effect on one's salary, responsibility, and prestige. . . . Unless all three features are affected, the transfer will not be considered a demotion." *Hamilton v. Telfair County Sch. Dist.*, 455 S.E.2d 23, 23 (Ga. 1995) (citing O.C.G.A. § 20-2-943(a)(2)(C)) (additional citation omitted).

_____

[14]Under state law, Dr. Hinson was entitled to a hearing if she were "demoted." *See* O.C.G.A. § 20-2-940.

25

Dr. Hinson's right to continued employment was defined by state law. *See Hatcher*, 809 F.2d at 1550 ("Georgia law creates a property right in continued employment for tenured teachers that may not be denied without granting certain substantive and procedural due process rights."). The property right Dr. Hinson received was not continued employment in the job of her choice (i.e., high school principal), but rather continued employment in whatever capacity the Board chose to use her, so long as she suffered no demotion. *See Maples v. Martin*, 858 F.2d 1546, 1550 (11th Cir. 1988) (when Georgia faculty members were transferred without loss of salary or rank, they had no property interest entitling them to due process). Because Dr. Hinson suffered no demotion as defined under state law, no property right was implicated. She was not entitled to relief under § 1983.

## CONCLUSION

We affirm the district court's denial of Dr. Hinson's motions to amend her complaint and to compel production. However, we reverse in part the grant of summary judgment against Dr. Hinson. Dr. Hinson established a prima facie Title VII case because she introduced sufficient evidence for a juror to conclude that she was a member of a protected class, qualified for her job, replaced by a man, and suffered an adverse employment action. She introduced detailed evidence from which a factfinder could infer that the Board's stated reasons for transferring her

26

were pretextual. In the circumstances, nothing further was needed for a reasonable jury to conclude that the County defendants discriminated against Dr. Hinson based on her sex. The district court, however, correctly granted summary judgment for the individual defendants on Dr. Hinson's Title VII claim.

We also affirm the district court's grant of summary judgment on Dr. Hinson's § 1983 due process claim. As contrasted to federal law (which for Title VII purposes might find an adverse employment action when there is a loss of either prestige, responsibility or pay), Georgia law requires a loss of all three before a plaintiff suffers a demotion activating the state-law-created tenure rights that would entitle Dr. Hinson to relief.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.